[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 2, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-11297

_____

D. C. Docket No. 01-08121-CV-SH

WILLIAM COLLADO,

Plaintiff-Appellant,

versus

UNITED PARCEL SERVICE, CO.,
a foreign corporation,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(August 2, 2005)**

Before CARNES and COX, Circuit Judges, and STROM[*], District Judge.

CARNES, Circuit Judge:

_____

[*] Honorable Lyle E. Strom, United States District Judge for the District of Nebraska, sitting by designation.

Willie Collado appeals the district court's order setting aside the jury verdict in his favor and granting judgment as a matter of law for his employer, United Parcel Service, on his discrimination and retaliation claims under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. Most of Collado's arguments revolve around the McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973), framework for proving a discrimination case based on circumstantial evidence.

One issue Collado has brought us is particularly interesting because it arises at the intersection—some might say collision—of two rules of law. It is a well-established rule in job discrimination cases involving circumstantial evidence that the existence of a prima facie case should not be revisited after the defendant's Fed. R. Civ. P. 50(a) motion has been denied. It is an equally well-established and even more fundamental rule that judgment should be entered for the defendant where the plaintiff has failed to prove a necessary element of his case. What happens when the district court decides at the end of the trial, even after judgment, that the plaintiff has not proven his claim because he has failed to establish a necessary element, which also is a component of the prima facie case?

That occurred in this case. The district court entered under Fed. R. Civ. P. 50(b) a post-verdict judgment for the defendant on the ground that Collado had

2

failed to prove he was disabled, and the court explained its decision in terms of the plaintiff's failure to make out a prima facie case. Collado complains that the court's Rule 50(b) post-verdict action amounts to revisiting the prima facie case question after it was settled at the Rule 50(a) stage.

There are other issues, as well, but before getting to any of the issues we will set out the historical and procedural facts that frame them all.

## I.

Collado, who has been an insulin-dependent diabetic since he was fourteen years old, was hired by UPS in 1991 as a part-time truck reloader in one of its south Florida facilities. He proved to be a well-liked and hard-working employee, and he was promoted to other positions at UPS, including driving trucks.

In order to drive most of UPS's trucks Collado had to be certified by the federal Department of Transportation. The DOT regulates all vehicles used in interstate commerce that weigh more than 10,000 pounds and imposes minimum qualifications for the people who drive those vehicles. 49 C.F.R. §§ 390.3(a), 390.5, 391.1(a). Ninety-five to ninety-eight percent of UPS's truck fleet in south Florida is DOT regulated. UPS gives its trucks number designations depending on the size of the vehicle, ranging from the P-20 (the smallest) to the P-1200 (the largest). All trucks larger than the P-500s weigh more than 10,000 pounds and are

3

DOT regulated. Any P-500 truck manufactured after 1984 is also DOT regulated because it weighs more than 10,000 pounds.

Because UPS does not assign any of its lighter unregulated trucks to regular full-time routes, it requires all of its full-time truck drivers to be DOT certified. To become DOT certified, a driver must undergo a physical exam and obtain a medical examiner's certificate verifying that he is physically qualified, as defined by the DOT's regulations. Id. § 391.41(a).

In 1993 Collado went to a physician chosen by UPS to get his DOT certification. He told the doctor about his diabetes and medications. Although the DOT regulations specifically state that insulin-dependent diabetics are not physically qualified to drive regulated vehicles, id. § 391.41(b)(3), the doctor nevertheless certified Collado as physically qualified and gave him a DOT card.

Based on that mistaken certification, UPS promoted Collado to full-time driver in October 1994. He held that position for four years, driving several different routes during that time. Depending on the route he was assigned, Collado drove trucks that varied in size, ranging from P-500s, some of which are regulated, through P-1000s, all of which are regulated. As a full-time driver, Collado was eligible for, and regularly earned, "productivity bonuses" for completing his deliveries on schedule.

4

In 1998 UPS district safety manager Herman Radish discovered that Collado was an insulin-dependent diabetic and, therefore, not physically qualified to hold a DOT certificate. After learning that, Radish ordered Collado's manager, Ralph Terrell, to remove Collado from his full-time driving position.

Following his removal from the full-time driving job in May of 1998, Collado was moved through a series of positions at UPS. One of them was a split-shift position in which Collado worked a partial morning shift inside the UPS facility and then returned to work another partial shift doing the same thing in the evening. Later Collado had a non-split, hybrid job where he pre-loaded trucks each morning and drove a P-500 truck in the afternoon.[1] He stayed in that hybrid position until February or March 1999, when Collado's new supervisor, Bob Story, returned him to a full-time driving position and permitted Collado to drive a DOT-regulated P-1000 truck all day. (It is not clear from the record why Collado was permitted to return to driving a P-1000 truck in spite of DOT regulations.)

When safety manager Radish learned that Collado was once more driving regulated trucks in violation of DOT regulations, Radish had Ralph Terrell, the center manager, remove Collado from that position. Terrell told Collado that he

---

[1] At that time, UPS thought Collado was still eligible to drive all P-500 trucks. UPS did not learn that P-500s made after 1984 weigh more than 10,000 pounds (and are, therefore, DOT regulated) until 2000, when a diabetic UPS employee passed out while driving a P-500 truck and caused a traffic accident death.

5

had been removed because UPS thought he "couldn't drive" due to his diabetes. Collado was briefly returned to his old split-shift position. Then, at Collado's request, UPS returned him to the non-split, hybrid position, where he spent his time pre-loading in the morning and driving a non-regulated P-500 truck in the afternoon.

On June 9, 1999, after he had twice been removed from his position as a full-time driver, Collado filed an EEOC charge. He claimed that he was removed from his position as a full-time driver even though he was "qualified for the position of Driver," and he complained about the split-shift and other positions UPS had given him. Collado also alleged in his EEOC charge that UPS had failed to put him back in his full-time driver position because he had "complained about [UPS's] discriminatory act of removing [him] and insisted on reinstatement."

That same month, in investigating Collado's complaint, Radish learned that UPS required all diabetic employees to complete a "Diabetes Protocol" before they could drive any trucks. The protocol is a medical questionnaire used by UPS to confirm that a diabetic employee is under a physician's care and successfully controlling his diabetes. Under its policy, UPS should have required Collado to complete the protocol before he was ever permitted to drive an unregulated P-500, but it had not done so because Radish had not been aware of the protocol. Once

6

Radish learned of the protocol, he insisted that Collado complete it before he could continue to drive the nonregulated P-500 trucks.

Thus, in June 1999, Collado was removed from his hybrid position, which involved driving unregulated P-500 trucks in the afternoon, and he was given the protocol paperwork to have his doctor fill out. While the completion and approval of Collado's protocol was pending, UPS moved him to an inside split-shift position where he would work a total of eight hours divided in two parts stretching over eighteen or nineteen hours. Collado opted to work only the morning part of that split-shift due to the difficulty of working both parts of it.

Collado's doctor signed his completed protocol on June 25, 1999. After Collado returned from a two-week paid vacation, he was informed by Terrell that because his protocol had been completed by his doctor and approved by UPS he could return to the hybrid pre-load/P-500 driving job. Terrell also asked Collado if he was going to drop the EEOC charge. Collado responded that he would not.

Collado returned to the hybrid position, driving what he terms a "junk" route in the afternoons. Collado found the route undesirable because it required him to deliver the packages that had been left behind by the other drivers—usually the heaviest packages. The route also required him to make deliveries within a large geographic area and to return to the facility to reload his truck during the day,

7

which made it difficult to complete the deliveries on time. During July, Terrell asked him two or three more times whether he was going to drop the EEOC charge and said he couldn't believe Collado would not drop the charges.

On July 28, 1999, Collado amended his EEOC discrimination charge to include allegations of further retaliation that had occurred since he filed his first EEOC charge. He alleged that UPS had retaliated against him for filing the initial charge by putting him in its smallest truck, denying him a regular route, pressuring him to withdraw his charge, and subjecting him to adverse working conditions for proceeding with that charge. After this amendment, Collado continued to drive the hybrid route, although Terrell allowed him to drive a full eight-hour day whenever a route and a suitable, non-regulated truck became available.

Subsequently, Collado injured his back and went on worker's compensation leave for about one year. When Collado was cleared to return to work with no limitations, UPS had filled the hybrid job he had previously held. Ultimately, Collado was out of work for almost another year because UPS did not have a position for him. He finally returned to UPS on December 17, 2001, in a "combo" job, which called for him to pre-load in the morning and drive an unregulated P-300 truck in the afternoons. Collado still holds that position.

**II.**

8

Collado sued UPS for disability discrimination under the ADA, retaliation under Title VII (later converted by amendment to a claim of ADA retaliation), and worker's compensation retaliation under Florida law. In his complaint, Collado claimed that he was a "qualified individual with a disability" and that "UPS was aware of [his] history of diabetes."

Collado's claims survived a motion by UPS for summary judgment and the case proceeded to a jury trial. At the close of Collado's case-in-chief, UPS made a motion under Fed. R. Civ. P. 50(a) for judgment as a matter of law.[2] It asserted that Collado had failed to make out a prima facie case of discrimination as required by McDonnell Douglas because he had shown neither that he was "disabled" for purposes of the ADA nor that he was "qualified" for the position of full-time driver. UPS also argued that Collado had failed to make out a prima facie case of

---

[2] Rule 50(a) provides:

Judgment as a Matter of Law.

(1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on an issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

(2) Motions for judgment as a matter of law may be made at any time before submission of the case to the jury. Such motion shall specify the judgment sought and the law and facts on which the moving party is entitled to the judgment.

Fed. R. Civ. P. 50(a).

retaliation because he had not shown that he had suffered an adverse employment action. The trial court initially reserved ruling on the motion but denied it the next day. UPS then presented its defense case, calling several witnesses.

At the close of all the evidence, UPS again moved for judgment as a matter of law under Rule 50(a) on the grounds that Collado had failed to establish any of the elements of an ADA discrimination claim or an ADA retaliation claim. The district court reserved ruling on this second Rule 50(a) motion and sent the case to the jury. The jury returned a verdict for Collado in the amount of $316,000 on the ADA discrimination and retaliation claims. It found for UPS on Collado's state-law worker's-compensation retaliation claim. After the verdict, UPS renewed its motion for judgment as a matter of law under Rule 50(b).[3] It argued that Collado

---

[3] Rule 50(b) provides:

> Renewing Motion for Judgment After Trial; Alternative Motion for New Trial.
>
> If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment—and may alternatively request a new trial or join a motion for a new trial under Rule 59. In ruling on a renewed motion, the court may:
>
> > (1) if a verdict was returned;
> > > (A) allow the judgment to stand,
> > > (B) order a new trial, or
> > > (C) direct entry of judgment as a matter of law; or
> > (2) if no verdict was returned;
> > > (A) order a new trial, or

10

had failed to provide sufficient evidence to support the jury's verdict as to the disability element of the ADA discrimination claim and as to any of the elements of the ADA retaliation claim. UPS also moved for a new trial and for remittitur.

The district court granted the Rule 50(b) motion and entered final judgment for UPS. The basis for the ruling on the discrimination claim was the court's view that Collado had failed to carry his burden of proof on the issue of whether he is disabled, the failure being that he had not identified any "major life activity" that his diabetes limited. In fact, the district court said, Collado's own testimony was that his diabetes did not interfere with any major activity. Thus, "[t]aking Collado at his word," his claim failed. Some of the court's discussion was cast in terms of disability being a component of a prima facie case of ADA discrimination, instead of an element of the claim itself. The court said, for example, that Collado "has failed to establish a prima facie case of discrimination and judgment must be entered as a matter of law in favor of UPS." It went on to say, however, that "there was no legally sufficient basis for a reasonabl[e] jury to find for Collado on his ADA discrimination and retaliation claims." The court provided no separate

---

(B) direct entry of judgment as a matter of law.

Fed. R. Civ. P. 50(b).

explanation for its ruling on the retaliation claim. It struck UPS's motion for a new trial and for remittitur as moot.

Thereafter, UPS moved to alter or amend the district court's judgment because the court had not ruled conditionally on the merits of UPS's motion for a new trial, as required by Fed. R. Civ. P. 50(c)(1). Collado moved for "clarification and/or reconsideration" of the grant of judgment to UPS on the ADA discrimination and retaliation claims.

In response, the district court entered a second order clarifying and amending its prior rulings. In this order the court reiterated that Collado's evidence was insufficient to support an ADA discrimination verdict in his favor. The court also stated that "there was insufficient evidence to permit a reasonable jury to find that UPS retaliated against Collado," because Collado had failed to establish a component of his prima facie case for retaliation. The court explained that, because Collado clearly was not disabled, he could not have had a "good faith, objectively reasonable belief" that UPS had discriminated against him due to his impairment, and as a result he had not shown that he had engaged in protected activity for which he was retaliated against. The court also conditionally granted UPS's motion for a new trial on the ground that the verdict for Collado was against

12

the great weight of the evidence. The district court entered final judgment for UPS, and Collado filed a timely appeal.

## III.

We review de novo a district court's grant of judgment as a matter of law under Rule 50(b), applying the same standard as the district court. Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1192 (11th Cir. 2004). In doing so, we look at the record evidence, drawing all inferences in favor of the nonmoving party. Id. at 1192–93. Judgment as a matter of law for the defendant is due when there is insufficient evidence to prove an element of the claim, which means that no jury reasonably could have reached a verdict for the plaintiff on that claim. Id. at 1192; Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552 (1986) ("The moving party is entitled to a judgment as a matter of law [where] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." (internal marks omitted)); Bogle v. Orange County Bd. of County Comm'rs, 162 F.3d 653, 659 (11th Cir. 1998) ("[I]n order to survive a defendant's motion for judgment as a matter of law . . . the plaintiff must present evidence that would permit a reasonable jury to find in the plaintiff's favor on each and every element of the claim.").

13

**IV.**

Collado first challenges the district court's grant of judgment as a matter of law to UPS on his ADA discrimination claim. He contends that it was improper primarily because it was based on the court's conclusion that he had failed to establish a component of his McDonnell Douglas prima facie case. In order to establish a prima facie case of ADA discrimination, Collado had to show that he: (1) had a disability; (2) was otherwise qualified to perform the job; and (3) was discriminated against based on his disability. Cleveland, 369 F.3d at 1193. The district court granted UPS's Rule 50(b) motion and entered judgment against him, Collado says, solely because it found that he had not shown the first component of a prima facie case, which is that he had a disability. According to Collado that was error, because binding precedent establishes that once a district court has determined that a prima facie case has been shown and denied a Rule 50(a) motion on that basis, neither that court nor this one can revisit the prima facie case question. Collado is right about the rule but wrong about whether it makes any difference in this case.

The prima facie case is an important part of the McDonnell Douglas framework for proving discrimination with circumstantial evidence. On the one hand, if a plaintiff establishes his prima facie case, he is entitled to a presumption

14

of discrimination and the burden of production shifts to the defendant. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254, 101 S. Ct. 1089, 1094 (1981). If the defendant then fails to meet its burden of production, the plaintiff is entitled to judgment as a matter of law based on his unanswered prima facie case. Id.; Wright v. Southland Corp, 187 F.3d 1287, 1291 (11th Cir. 1999). On the other hand, if a plaintiff fails to establish a prima facie case, the defendant is entitled to judgment as a matter of law (unless the plaintiff can prove discrimination by some other means, such as by direct evidence of discrimination). See, e.g., Cooper v. Southern Co., 390 F.3d 695, 745 (11th Cir. 2004) (affirming the district court's grant of summary judgment to the defendant in a compensation discrimination case because the plaintiff failed to establish her prima facie case); Schoenfeld v. Babbitt, 168 F.3d 1257, 1267 (11th Cir. 1999) (same).

Important as the prima facie case question initially is, however, both the Supreme Court and this Court have repeatedly recognized that there is a point at which a trial has progressed too far to revisit the question of whether one exists. That point is "when the defendant fails to persuade the district court to dismiss the action for lack of a prima facie case, and responds to the plaintiff's proof by offering evidence of the reason for the plaintiff's rejection." U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714–15, 103 S. Ct. 1478, 1481 (1983)

15

(footnote omitted); accord, e.g., Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 67–68, 107 S. Ct. 367, 371 (1986); Cleveland, 369 F.3d at 1194 ("After a trial on the merits, an appeals court should not revisit whether the plaintiff established a prima facie case. . . . The only relevant question becomes whether Cleveland's termination was motivated by her disability."); Tidwell v. Carter Prods., 135 F.3d 1422, 1426 n.1 (11th Cir. 1998) ("Our task is not to revisit whether the plaintiff below successfully established a prima facie case of discrimination. . . . [T]he question of whether the plaintiff properly made out a prima facie case is no longer relevant."); Combs v. Plantation Patterns, 106 F.3d 1519, 1539 n.11 (11th Cir. 1997) (because a full trial on the merits had been held, "the question of whether Combs properly made out a prima facie case is no longer relevant" (quotation omitted)); Richardson v. Leeds Police Dep't, 71 F.3d 801, 806 (11th Cir. 1995) (per curiam) ("Richardson argues on appeal that the district court erred by visiting whether he had established a prima facie case of discrimination after the action was fully tried on the merits, in violation of [Aikens]. We agree that it was wrong for the court to follow this procedure.").

"Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case," the focus should no longer be on the preliminary question of the prima facie case but on the "ultimate question

16

of discrimination <u>vel non</u>." <u>Aikens</u>, 460 U.S. at 713–15, 103 S. Ct. at 1481–82.

That is, once the trial has proceeded to the second step of the <u>McDonnell</u>

<u>Douglas</u> burden-shifting framework, the first step, which is the prima facie issue,

should be left behind. From that point, the inquiry should focus on the ultimate

question of "whether the defendant intentionally discriminated against the

plaintiff." <u>Id.</u> at 715, 103 S. Ct. at 1482 (internal quotation omitted). Or, as we

have put it, at this advanced stage, "the question of whether the plaintiff properly

made out a prima facie case is no longer relevant." <u>Combs</u>, 106 F.3d at 1539 n.11

(internal quotation omitted); <u>accord</u> <u>Aikens</u>, 460 U.S. at 715, 103 S. Ct. at 1482;

<u>Cleveland</u>, 369 F.3d at 1194.

The specific wisdom of this "don't-look-back rule" is evident.[4] The goal of

the <u>McDonnell Douglas</u> burden-shifting framework is "progressively to sharpen

the inquiry into the elusive factual question of intentional discrimination."

<u>Burdine</u>, 450 U.S. at 256 n.8, 101 S. Ct. at 1095 n.8 (1981). "The prima facie case

serves an important function in the litigation: it eliminates the most common

nondiscriminatory reasons for the plaintiff's rejection." <u>Id.</u> at 253–54, 101 S. Ct. at

1094. After the defendant has met its burden of production by offering other

---

[4] By "specific wisdom" we mean specific to this area of the law, as distinguished from general wisdom applicable to all of life as conveyed in Satchel Paige's famous advice: "Don't look back. Something might be gaining on you."

17

legitimate reasons for its employment decision, however, "the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity." Id. at 255, 101 S. Ct. at 1094–95 (footnote omitted). At that point, the presumption of discrimination that arose when the plaintiff made his prima facie showing "drops from the case," id. at 255 n.10, 101 S. Ct. at 1095 n.10, quoted in Aikens, 460 U.S. at 715, 103 S. Ct. at 1481, and "the case is placed back into the traditional framework—in other words, the plaintiff still bears the burden of proving, more probably than not, that the employer took an adverse employment action against him on the basis of a protected personal characteristic." Wright v. Southland Corp., 187 F.3d 1287, 1291 (11th Cir. 1999). It makes sense that once the product of the prima facie case (a presumption of discrimination) has dropped out of the case at trial, issues about the prima facie case should drop out as well. There is no good reason to argue about them any more.

Collado's position in this appeal rests on the don't-look-back rule. He is right that, because the district court had determined that Collado made out a prima facie case and had denied UPS's Rule 50(a) motion on that ground, the court should not have reconsidered whether a prima facie case existed at the Rule 50(b) stage. Unfortunately for Collado, that is not the end of the analysis. Our review is, as we have said, de novo. That means we review the judgment, not the soundness

18

of the district court's explanation for it. See Sec. & Exch. Comm'n v. ETS Payphones, Inc., 408 F.3d 727, 736 n.10 (11th Cir. 2005) (per curiam) ("We review district court judgments; we do not grade the opinions."); United States v. $242,484.00, 389 F.3d 1149, 1155 (11th Cir. 2004) (en banc) ("We do not sit to grade the thoroughness or clarity of district court opinions but to review their judgments . . . ."). If judgment as a matter of law was due to be granted, it matters not whether the district court got the reasons for doing so right. See Turner v. Am. Fed'n of Teachers Local 1565, 138 F.3d 878, 880 n.1 (11th Cir. 1998) ("We must affirm the judgment of the district court if the result is correct even if the district court relied upon a wrong ground or gave a wrong reason."); see also Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1256 (11th Cir. 2001) ("[W]e may affirm the [district court's] judgment on any ground that finds support in the record." (internal quotation omitted)); Gaston v. Bellingrath Gardens & Homes, Inc., 167 F.3d 1361, 1363 n.1 (11th Cir. 1999) (per curiam).

The question for us is only the correctness of the result: was post-verdict judgment as a matter of law due to be granted to UPS on Collado's ADA discrimination claim? We think it was if, as UPS insists and the district court decided, Collado failed to provide sufficient evidence on the disability element of

19

his ADA claim.[5]  Collado protests that disability is a component of the prima facie case for an ADA claim and that allowing a post-verdict judgment as a matter of law on that ground would violate the rule, which we have just discussed, against revisiting the existence of a prima facie case at the conclusion of a trial.

Collado's position reflects a fundamental misunderstanding of what we are calling the don't-look-back rule.  That rule prevents an inquiry into the prima facie case after all of the evidence is in; it does not prevent an inquiry into the existence of an element of the claim.  The authority and duty of a court to decide whether all elements of a claim have been proven does not end with the denial of a Rule 50(a) motion.  If there is insufficient evidence for a jury reasonably to have found one of the elements of a claim to have been proven, the court has a duty to grant a proper Rule 50(b) motion.[6]

---

[5] The elements of an ADA discrimination claim are:  (1) "That the Plaintiff had a 'disability,' as hereafter defined"; (2) "That the Plaintiff was a 'qualified individual' as hereafter defined"; (3) "That the Plaintiff was [refused employment] [discharged from employment] [not promoted] by the Defendant"; and (4) "That the Plaintiff's disability was a substantial or motivating factor that prompted the Defendant to take that action."  Eleventh Circuit Pattern Jury Instructions 1.5.2.

[6] By "proper Rule 50(b) motion" we mean one for which the necessary predecessor Rule 50(a) motion raising those grounds was filed at the close of the trial.  See Mark Seitman & Assocs. v. R.J. Reynolds Tobacco Co., 837 F.2d 1527, 1531 (11th Cir. 1988) ("A defendant's [Rule 50(a)] motion for directed verdict at the close of the plaintiff's case will not suffice unless it is renewed at the close of all the evidence."); Sims' Crane Serv. v. Ideal Steel Prods., Inc., 800 F.2d 1553, 1557 (11th Cir. 1986) (reversing the district court's grant of defendant's Rule 50(b) motion because the defendant had never moved for directed verdict under Rule 50(a)); Shannon v. BellSouth Telecomm., Inc., 292 F.3d 712, 717 n.3 (11th Cir. 2002) ("If a party asserts new grounds in its [Rule 50(b)] motion for judgment as a matter of law that it did not assert in its

Where a component of the prima facie case is also an element of the claim, as the existence of a disability is in an ADA discrimination case, deciding that the claim has not been proven may be confused with revisiting the prima facie case.[7] Collado's position does that. His position on the don't-look-back rule would require a district court to enter judgment for a plaintiff on a claim even though an element of the claim had not been proven, and that would pervert the purpose of the rule. The reason district courts are not allowed to look back at the prima facie case question once a Rule 50(a) motion on it has been denied is that, as we have

initial motion for judgment as a matter of law, a court may not rely on the new grounds to set aside the jury's verdict." (quotation omitted)).

We reject Collado's argument that a district court is powerless to enter judgment as a matter of law under Rule 50(b) where it has denied, instead of reserved ruling on, the Rule 50(a) motion. This argument, which has something of a collateral estoppel flavor, has no basis in Rule 50. Instead, Rule 50(b) plainly states that the court is permitted to direct entry of judgment after a verdict whenever "for any reason" it has not granted a Rule 50(a) motion for judgment as a matter of law. Fed. R. Civ. P. 50(b). "For any reason" includes situations where the court has denied the earlier motion. As Wright and Miller explain, Rule 50(b) creates a legal fiction that "even though the trial court expressly has denied the [Rule 50(a)] motion, it is considered to have reserved decision on it." 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2522 (2d ed. 1994); see Neely v. Martin K. Eby Constr. Co., 386 U.S. 317, 321, 87 S. Ct. 1072, 1076 (1967) ("Under Rule 50(b), if a party moves for a directed verdict at the close of the evidence and if the trial judge elects to send the case to the jury, the judge is 'deemed' to have reserved decision on the motion."); Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 250, 61 S. Ct. 189, 194 (1940) (Rule 50(b) does not require the court to reserve the question of law raised in the Rule 50(a) motion).

[7] Another source of confusion stems from the fact that the term "prima facie case" has two meanings. Traditionally, it refers to the "quantum of evidence needed to create a jury question" or "a case strong enough to go to a jury." Wright, 187 F.3d at 1292. In the McDonnell Douglas context, however, the term relates to a step in the analytical framework and means the "establishment of the facts required to establish the McDonnell Douglas presumption." Id. When we use the term "prima facie case" in this opinion, we are referring to the first step of the McDonnell Douglas framework.

21

explained, once a case has advanced that far in the trial, a court should no longer be considering analytical preliminaries. Instead, once the Rule 50(a) point is passed, the entire focus should be on the ultimate issue of whether discrimination has been proven. Allowing a judgment to stand when there has been no discrimination—as, for example, when the plaintiff in an ADA discrimination case is not disabled—would not further the purpose of focusing on whether discrimination has been proven. It would defeat that purpose and the purpose of the trial.

There is another way to illustrate why we must reject Collado's position that the don't-look-back rule insulates a failure to prove an element of a claim from Rule 50(b) scrutiny. The rule prevents us, as well as district courts, from looking into the existence of a prima facie case after the Rule 50(a) stage. Beaver v. Rayonier, 200 F.3d 723, 727 (11th Cir. 1999) ("[N]either the district court nor the court of appeals may revisit the existence of a prima facie case . . . ."). For that reason, accepting Collado's position would block us from reviewing on appeal the sufficiency of the evidence to prove any element of a discrimination claim that is also a component of the prima facie case. Appellate review of the evidentiary sufficiency of a claim is something we have the duty to perform when a defendant, who has properly preserved the issue, brings us an appeal presenting it.

22

This case illustrates the effect that accepting Collado's position would have. He argues that we are barred from reviewing whether he has established the disability element of his claim. We are barred, he says, because examining that element would amount to looking back on whether there was a prima facie case; that's because the existence of a disability is a critical component of a prima facie case just as it is an essential element of the claim. Under Collado's theory any inquiry into the disability issue after a Rule 50(a) motion has been denied is barred. He would have us let the tail wag the dog.

Collado has things backwards. At the end of a trial it is "the question of whether the plaintiff properly made out a prima facie case [that] is no longer relevant," Combs, 106 F.3d at 1539 n.11 (internal quotation omitted), not the sufficiency of the evidence of discrimination. What counts once a case is past the Rule 50(a) stage is not whether the case should be past that stage, but "whether the defendant intentionally discriminated against the plaintiff." Aikens, 460 U.S. at 716, 103 S. Ct. at 1482 (internal marks omitted).

One final matter bears discussion before we move on to apply what we have said to this case. Our holding that the don't-look-back rule does not bar the district court from reconsidering, or us from reviewing, the existence of an element of the claim that is also a component of the prima facie case does not mean that the rule

23

has no force and effect. The rule serves as a bar, prevents a look back, where a component of the prima facie case that is not an element of the claim is concerned. See, e.g., Cleveland, 369 F.3d at 1194 (refusing, in reviewing the district court's grant of the defendant's Rule 50(b) motion, to consider its argument that the plaintiff had failed to establish a non-element component of her prima facie case); Richardson, 71 F.3d at 801 (vacating the district court's grant of judgment as a matter of law to defendant, in part because it was based on the plaintiff's failure to establish a non-element component of his prima facie case).

An example that comes to mind is a Title VII discriminatory failure to promote claim. The components of the prima facie case are: (1) that the plaintiff is a member of a protected class; (2) that he was qualified for and applied for the promotion; (3) that he was rejected; and (4) that other equally or less qualified employees who were not members of the protected class were promoted. Combs, 106 F.3d at 1539 n.11. The fourth component, the one requiring outside-the-class comparators, is not an element of the claim itself. Once a district court has denied a Rule 50(a) motion for failure to show a prima facie case, neither that court nor this one may conclude that judgment as a matter of law should be granted under Rule 50(b) solely because no outside-the-class comparators were shown. Although the absence of comparators may be relevant to whether the plaintiff has proven that

24

his failure to be promoted was the result of discrimination, it is not necessarily a claim-killing fact at the post-Rule 50(b) stage. Difficult as it might be to prove, a promotion could be denied for discriminatory reasons even though no one outside the protected class was promoted—even though there were no comparators and therefore no prima facie case. See also Wright, 187 F.3d at 1292 (giving a hypothetical in which a plaintiff alleging discriminatory firing who failed to prove a component of the prima facie case could nonetheless prove the claim).[8]

Back to the present case, we are dealing with a component of the prima facie case that is also an element of the claim. Before us is an ADA discrimination claim, and the issue is whether Collado presented sufficient evidence for a jury reasonably to have found that he is disabled. Unless he has a "disability," as that term is defined in the ADA, Collado had no valid ADA discrimination claim and judgment as a matter of law was properly entered against him at the Rule 50(b) stage.

The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a

---

[8] We recognize, of course, that the don't-look-back rule will not apply in cases like this one, where all the components of the prima facie case are also elements of the claim itself. That overlap is true of ADA cases generally, but the inapplicability of the rule in some kinds of employment discrimination cases is not an argument against the rule's existence or for applying the rule in a way in which it was never intended.

record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Starting with alternative (A) of the definition, it is undisputed that Collado suffers from insulin-dependent diabetes, which is a physical impairment for ADA purposes, see 45 C.F.R. pt. 84 App. A, subpart (A)(3) (defining diabetes as an impairment). So, he satisfies the first half of the alternative (A) definition of "disability." That is not enough, because the other half of the definition requires that the impairment substantially limit one or more of his major life activities; that determination must be made on a case-by-case basis.

The Supreme Court made that much clear in Sutton v. United Air Lines, Inc., 527 U.S. 471, 119 S. Ct. 2139 (1999). In the course of explaining why medicinal or mitigation measures should be considered when determining if a person is disabled, the Court said:

> The agency guidelines' directive that persons be judged in their uncorrected or unmitigated state runs directly counter to the individualized inquiry mandated by the ADA. The agency approach would often require courts and employers to speculate about a person's condition and would, in many cases, force them to make a disability determination based on general information about how an uncorrected impairment usually affects individuals, rather than on the individual's actual condition. For instance, under this view, courts would almost certainly find all diabetics to be disabled, because if they failed to monitor their blood sugar levels and administer insulin, they would almost certainly be substantially limited in one or more major life activities. A diabetic whose illness does not impair his or her daily activities would therefore be considered disabled simply because he or she has diabetes. Thus, the guidelines approach would create a system in which persons often must be treated as members of a group of

26

people with similar impairments, rather than as individuals. <u>This is contrary to both the letter and the spirit of the ADA.</u>

<u>Id.</u> at 483–84, 119 S. Ct. at 2147 (emphasis added). We have a decision to the same effect. <u>Cash v. Smith</u>, 231 F.3d 1301, 1306 (11th Cir. 2000) (affirming the grant of summary judgment against an ADA plaintiff because even though "her diabetes, migraines, and depression . . . have had an adverse impact on Cash's life, there is no evidence that they have limited her in a major life activity" (footnote omitted)).

What Collado had to do to win on this § 12102(2)(A) definitional track is to provide evidence from which a jury reasonably could find that his diabetes substantially impairs at least one major life activity. Collado says he did that through his own testimony, which he characterizes as having "established that his diabetes substantially limits his ability to eat normally, digest food without medication, and maintain any degree of health without carefully monitored insulin injections . . . ." Assuming that eating is a major life activity, <u>see</u> <u>Fraser v. Goodale</u>, 342 F.3d 1032, 1039–40 (9th Cir. 2003), <u>Lawson v. CSX Transp., Inc.</u>, 245 F.3d 916, 923 (7th Cir. 2001), Collado's argument fails because his testimony did not provide a reasonable basis for the jury to find that his diabetes substantially impaired his eating.

On direct examination, Collado testified that he had to "watch" what he eats and avoid certain foods—"mostly sugars"—because of his diabetes. On cross-examination, however, Collado admitted that as long as he is taking insulin he can eat and digest his food normally. He even admitted that his diabetes has not affected his lifestyle in any way. This is how that testimony went:

Q. [Y]our diabetes does not in any way affect your ability to drive a vehicle?

A. No.

Q. And you can walk?

A. Yes.

Q. You can run?

A. Yes.

Q. You can see?

A. Yes.

Q. You can eat?

A. Of course.

Q. You can digest food?

A. Yes, as long as I am taking my insulin.

Q. Exactly. And your diabetes doesn't affect your ability to work?

28

A. Correct.

Q. Or to care for yourself?

A. Correct.

Q. In fact, your diabetes hasn't affected your lifestyle in any way; correct?

A. Correct.

Q. And with proper self monitoring, you are in no way limited by your diabetes in what you do during the day or how you do it; correct?

A. Yes, that's true.

No jury reasonably could find from his testimony that Collado was substantially limited in eating or any other major life activity. There is nothing to suggest that Collado is "significantly restricted" in eating as compared to "the average person in the general population." See 29 C.F.R. § 1630.2(j)(1) (defining when an impairment is "substantially limiting"). Many people have to monitor their food intake for health and lifestyle reasons, and avoiding "mostly sugars" is not "significantly restricted" for this purpose. If it were, all insulin-dependent diabetics would have a "disability" for ADA purposes, and we know from Sutton that they do not. See Sutton, 527 U.S. at 471, 119 S. Ct. 2139.

29

We find unpersuasive Collado's attempt to liken himself to the "brittle diabetic" in <u>Fraser</u>, whom the Ninth Circuit found had presented a genuine issue of material fact as to whether she was substantially limited in the life activity of eating. 342 F.3d at 1041. The <u>Fraser</u> Court's description of that plaintiff's extreme dietary limitations shows the difference between Collado's condition and hers:

> Fraser's diabetes regimen is perpetual, severely restrictive, and highly demanding. . . . She must vigilantly monitor what and how much she eats. She must time her daily shots and meals so carefully that it is not safe for her to live alone. (She could end up in the ambulance if she took too long a nap between a shot and breakfast.) She must always have certain foods available in case her blood sugar drops or skyrockets. . . . She cannot put a morsel of food in her mouth without carefully assessing whether it will tip her blood sugars out of balance. She cannot skip or postpone a snack or meal without cautiously studying her insulin and glucagon levels. She must constantly, faithfully, and precisely monitor her eating, exercise, blood sugar, and other health factors, and even this is no guarantee of success.

<u>Id.</u>

We also reject Collado's argument that the fact he is unable to properly digest food or stay healthy without medication means he is disabled. As the Supreme Court told us in <u>Sutton</u>, the question of whether a plaintiff is substantially impaired for disability purposes is to be considered in light of available mitigation measures such as taking insulin. 527 U.S. at 482–83, 119 S. Ct. 2146–47. Finally, nothing in the record shows that Collado's diabetes substantially limits him, or

30

limits him at all, in any other major life activity. As Collado's testimony that we have previously quoted establishes, he is able to drive, etc. See Cash, 231 F.3d at 1306 (stating that plaintiff's testimony that she was "an active person who walks, swims, fishes, and had held a 40-hour-a-week job" showed she was not substantially limited in any major life activity). For all of these reasons, Collado failed to present evidence from which a jury reasonably could find that he has a "disability" within the § 12102(2)(A) definition of that term.

As for the § 12102(2)(B) definition of "disability," Collado also failed to present sufficient evidence that he has a record of a substantially limiting impairment. The evidence shows that Collado has had diabetes for many years, but the long-term existence of an impairment is not enough to establish a disability. Instead, a plaintiff must show that the impairment he suffered in the past substantially limited him in at least one major life activity. 29 C.F.R. § 1630.2(k); see also Hillburn v. Murata Elec. N. Am., Inc., 181 F.3d 1220, 1228–29 (11th Cir. 1999). There was no evidence from which a jury could determine that Collado's diabetes has ever substantially limited him in any major life activity, not in the past any more than at the time of the trial.

As for the third alternative definition, Collado has failed to present sufficient evidence that UPS regarded him as having an impairment that substantially limits a

31

major life activity, which is necessary to satisfy the § 12102(2)(C) definition of "disability." See Hillburn, 181 F.3d at 1230; Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1327 (11th Cir. 1998). Collado contends that UPS's refusal to let him drive DOT-regulated trucks due to his diabetes is enough to establish that it regarded him as substantially limited in the major life activity of driving or working. The record does show that UPS regarded Collado as unable to fill the position of full-time truck driver due to his diabetes.

Being "regarded as unable to perform only a particular job," however, "is insufficient, as a matter of law, to prove that [the plaintiff] is regarded as substantially limited in the major life activity of working." Murphy v. United Parcel Serv., 527 U.S. 516, 525, 119 S. Ct. 2133, 2139 (1999). Collado had to prove that UPS considered him "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes." 29 C.F.R. § 1630.2(j)(3)(i); see also Cash, 231 F.3d at 1306. "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working. Thus, an impairment must . . . be perceived to preclude [] an individual from more than one type of job, even if the job foreclosed is the individual's job of choice." Rossbach v. City of Miami, 371 F.3d 1354, 1359 (11th Cir. 2004) (citation omitted).

There is no evidence that UPS regarded Collado as substantially limited from any job other than that of full-time driver at UPS, much less from a class or broad range of jobs. UPS gave Collado several different positions after pulling him from the full-time driving position. In fact, Collado currently works at UPS in a position where he pre-loads in the morning and drives an unregulated truck in the afternoon. No jury reasonably could find that UPS regarded Collado as substantially impaired from the major life activity of working.

Nor does the evidence support Collado's contention that UPS regarded him as substantially impaired in driving, which he contends is a major life activity. In any event, we have held that driving is not a major life activity for purposes of the ADA. See Chenoweth v. Hillsborough County, 250 F.3d 1328, 1329 (11th Cir. 2001) (noting that, while the enumeration of major life activities in the EEOC regulations is not exhaustive, "driving is not only absent from the list but is conspicuously different in character from the activities that are listed").

Because Collado failed to provide sufficient evidence for a jury reasonably to find that he suffered from a "disability" within the meaning of that term as it is defined in the ADA, § 12102(2)(A)–(C), judgment as a matter of law was due to be granted to UPS on the ADA discrimination claim. The grant of the Rule 50(b) motion and the resulting judgment for UPS on that claim will be affirmed.

## V.

Collado also challenges the judgment for UPS on his ADA retaliation claim. The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA]." 42 U.S.C. § 12203(a). Collado contended that UPS removed him from the position of full-time driver and gave him less desirable positions in retaliation for his filing an EEOC charge claiming disability discrimination. The jury verdict was in Collado's favor on this claim, but the district court concluded that there was insufficient evidence to support it and granted UPS's Rule 50(b) motion for judgment as a matter of law.

Collado contends here, as he did on the discrimination claim, that the district court erred in granting UPS's Rule 50(b) motion, because the court looked back to whether Collado had established a prima facie case and entered judgment on that basis. It is not clear to us that the district court did look back to the prima facie case when it granted judgment on the retaliation claim, but even if the court did, that mistake does not affect our decision. As with the discrimination claim, our review of the judgment for UPS is de novo and the question is whether judgment as a matter of law was due to be entered for UPS, not whether the district court's

34

reasoning for doing so is correct. See ETS Payphones, Inc., 408 F.3d at 736 n.10;

$242,484.00, 389 F.3d at 1155; Turner, 138 F.3d at 880 n.1.

In order to prove an ADA retaliation claim, a plaintiff must show that: (1) he "engaged in conduct protected by the ADA"; (2) he was subjected to an adverse employment action at the time, or after the protected conduct took place"; and (3) the defendant "took an adverse employment action against [him] because of [his] protected conduct." 3C Fed. Jury Prac. & Instr. § 172.24 (5th ed.) (essential elements for an ADA retaliation claim).

As for the first element, UPS argues that Collado failed to establish that he engaged in any protected activity. We agree with Collado, however, that UPS is barred from raising this argument because it failed to assert the ground in the Rule 50(a) motion it filed. See Shannon v. BellSouth Telecomms., Inc., 292 F.3d 712, 717 n.3 (11th Cir. 2002) (stating that a court may not rely on a ground for a Rule 50(b) motion that was not included in the Rule 50(a) motion); Ross v. Rhodes Furniture, Inc., 146 F.3d 1286, 1289 (11th Cir. 1998) (same). The first time UPS raised its no-protected-activity argument was at the post-verdict stage, and that is too late.

As for the adverse action element, Collado cannot rely on UPS removing him from his full-time driving position. He cannot because that was done before

35

Collado had filed his EEOC charge, and the filing of that charge is the protected conduct he asserts.[9] See Griffin v. GTE Fla., Inc., 182 F.3d 1279, 1284 (11th Cir. 1999) ("At a minimum, [the plaintiff] must show that the adverse act followed the protected conduct . . . ."). Collado does not contest that very hard but argues instead that action UPS took after he filed the EEOC charge amounts to adverse employment action. He testified that, after he filed the charge, UPS removed him from his hybrid position and put him into a less desirable split-shift position involving no driving. That position required Collado to work from 4 a.m. until 8 a.m., be off for a long break, and then work from 5 p.m. until 10 p.m. or 11 p.m. He was only in that position for a couple of weeks. We need not decide if that short-term change in working hours constituted an adverse employment action, because even if it did Collado loses on the third element, which is the causal connection requirement.

There can be no dispute about the existence of the policy that UPS asserted as the reason it temporarily removed Collado from his hybrid position which

_____

[9] Collado's initial EEOC charge alleged that UPS had retaliated against him on the basis of other conduct; namely, his insistence on reinstatement after he had been removed from the full-time driving position in 1998. At trial and in this appeal, however, the only protected conduct Collado has asserted is the filing of his EEOC charge on June 9, 1999. We will not consider claims, issues, or arguments that an appellant has not raised in either the district court or this Court. Access Now, Inc. v. Southwest Airlines Co., 385 F.3d 1324, 1331 (11th Cir. 2004); Adler v. Duval County Sch. Bd., 112 F.3d 1475, 1481 n.12 (11th Cir. 1997).

36

involved driving, and put him in the split-shift position which did not. The parties stipulated that UPS had a "Medical Evaluation Program for Diabetes," including a "Diabetes Protocol," and that it applied to all insulin-dependent diabetics who wished to drive unregulated trucks.[10] The program prohibited diabetic employees from driving any truck until the protocol had been completed by a medical doctor and approved by UPS. The employee had to obtain from his doctor a certification that he was under medical care and that his diabetes was being successfully controlled. It is also undisputed that an insulin-dependent diabetic whose disease is not under control can pose serious safety problems when driving trucks. Indeed, the record establishes that one of UPS's diabetic employees had previously passed out while driving a truck for the company and caused a traffic accident death.

The evidence showed without dispute that at the time Collado was removed from his hybrid driving position and put into the non-driving, split-shift position, he had not completed the Diabetes Protocol. There is no evidence that any other insulin-dependent diabetic had been permitted to drive without completing it. The record is also undisputed that Collado was transferred back to his preferred hybrid position as soon as he completed the protocol and it was approved. There is nothing in the evidence to suggest any delay attributable to UPS in the completion

---

[10] Recall that unregulated trucks were the only ones an insulin-dependent diabetic like Collado could drive under DOT regulations.

and approval of the protocol. (The only delay was occasioned by the fact that Collado was on paid vacation when the protocol was actually sent to UPS and approved by it). Indeed, he was out of the preferred hybrid position for only, in his words, "a couple of weeks."

The legitimacy and importance, for public safety purposes, of UPS's Diabetes Program and Protocol cannot be questioned. Nor can there be any question that it was fairly and non-discriminatorily applied to Collado. His argument is that these important safety-related requirements were not applied to him until he filed the EEOC charge. In other words, Collado got a break to which he was not entitled, one that might have endangered public safety, and according to him he would have continued to get that break, and public safety might have continued to be endangered but for the fact that he filed the EEOC charge. There are serious public policy problems with interpreting and applying the law in a way that would discourage employers from enforcing measures that safeguard the safety of the public, regardless of their motivation for doing so. In any event, no jury could reasonably find from the evidence that UPS applied its Diabetes Program and Protocol to Collado for retaliatory reasons.

The facts Collado pointed to in support of his theory that retaliation is the reason the important, safety-related requirements that should have been applied to

him all along were finally applied to him are that: the Diabetes Program and Protocol had been in effect since 1995, had never been applied to him before, and were applied within two months after he filed the EEOC charge; and the manager who implemented the decision to change Collado's position pending compliance with the program and protocol, Ralph Terrell, knew about the filing of the EEOC charge and asked Collado about it several times. The unrebutted testimony of Herman Radish, UPS's safety manager, however, was that he had not been aware of the diabetes-specific policy and protocol before, even though he had been in that position since 1992. Radish testified that he had discovered this program and protocol when investigating whether Collado could be a full-time driver, which is an issue that arose after he learned that Collado was an insulin-dependent diabetic. Radish discovered that fact and began investigating the ramifications of it before Collado filed the EEOC charge. It was Radish who informed Terrell of the problem and of the requirements of the Diabetes Program and Protocol and instructed Terrell to ensure that Collado did not drive a truck for UPS until those requirements were met.

All of the evidence taken as a whole is insufficient for a jury reasonably to find a causal connection between Collado's filing of the EEOC charge and UPS's application of its Diabetes Program and Protocol to him, resulting in Collado being

39

removed from a driving position for a couple of weeks. In addition to the dearth of evidence indicating retaliatory motivation, there is the inescapable fact that Radish did what any reasonable safety manager in his position would have felt compelled to do. In view of that, any inference his action was motivated by retaliatory animus is unreasonable. Judgment was properly entered for UPS on this claim.

AFFIRMED.