[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
Aug. 11, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-16229
Non-Argument Calendar

_____

D. C. Docket No. 07-21398-CV-PAS

MS. MISLEHIVY CALVO,

Plaintiff-Appellant,

versus

WALGREENS CORPORATION,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 11, 2009)

Before CARNES, MARCUS and ANDERSON, Circuit Judges.

PER CURIAM:

Mislehivy Calvo appeals the district court's grant of summary judgment

against her in her discrimination and retaliation suit against Walgreens Corporation under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12203(a) and 12112(a).

## I.

We review an order granting summary judgment de novo, applying the same standard as the district court. Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311 (11th Cir. 2002). Summary judgment is appropriate only when the evidence, viewed in the light most favorable to the non-moving party, presents no genuine issue of any material fact and compels judgment as a matter of law. Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552 (1986). In assessing whether there is any genuine issue of fact, we must avoid weighing conflicting evidence or making credibility determinations. Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 1999). Instead, "we view the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party." Allmond v. Akal Sec., Inc., 558 F.3d 1312, 1316 (11th Cir. 2009) (internal quotation marks omitted).

## II.

Viewed in the light most favorable to Calvo, the facts are these: Calvo worked at Walgreens from 2001 until 2006. In July 2002, she was promoted to

2

assistant manager. A year later, a genetic heart condition caused Calvo to lose consciousness while she was driving. She was severely injured in the resulting crash. Calvo needed multiple surgeries on her arms, both of which were fractured in the accident. Although her right arm has partially recovered, her left arm and hand are non-functional and are permanently in a brace.

During her slow recovery, Calvo took leaves of absence from Walgreens. After returning to work six months after the accident, she was out again from July 2004 until October 2004, from February 2005 until April 2005, and finally from October 2005 until her termination in early 2006. During those absences Calvo had additional surgeries on her arms.

In January 2006, Calvo wanted to return to work and met with Marie LeCuyer, a regional manager at Walgreens. LeCuyer requested medical documentation that released Calvo to return to work, but the only doctor's note that Calvo could provide, dated December 16, 2005, did not release Calvo to work. The doctor had written, "Will re-evaluate before release." LeCuyer therefore asked for further information about Calvo's medical condition and her job. Eventually Calvo produced a second doctor's note, dated January 31, 2006, which stated that she could return to work February 6. However, the doctor had not checked the box authorizing return "To regular occupation," but instead checked the other box,

3

authorizing return "To any other occupation." The note added that "No lifting, carrying [,] pushing or pulling anything over 5 lbs" was allowed.

After providing that doctor's note, Calvo expected to return to work but LeCuyer refused to allow it. Calvo met with her local manager, Mario Hernandez, who passed along LeCuyer's decision by stating that "You cannot work at Walgreens for your limitations." Calvo believed that she had been terminated and immediately sought unemployment benefits. Walgreens asserts that she was simply not yet cleared for work and so remained on medical leave. According to Walgreens, Calvo was terminated later, in June 2006, once her disability benefits had expired and she had not returned to work.

In May 2007, after exhausting administrative remedies, Calvo filed a complaint against Walgreens. She asserted that Walgreens had discriminated against her on the basis of her disability, in violation of 42 U.S.C. § 12112(a), and had retaliated against her by harassing her and refusing to accommodate her by not allowing her to return to work, in violation of 42 U.S.C. § 12203(a). The district court granted summary judgment in favor of Walgreens on both of Calvo's claims. This is her appeal.

## III.

Calvo first contends that Walgreens discriminated against her on the basis of

4

her disability by failing to provide a reasonable accommodation to allow her to perform her duties as an assistant manager.

To establish an ADA violation a plaintiff may use circumstantial evidence according to the traditional Title VII burden-shifting analysis. Wascura v. City of South Miami, 257 F.3d 1238, 1242 (11th Cir. 2001); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04, 93 S. Ct. 1817, 1824–25 (1973). Under this burden-shifting analysis, the plaintiff must first establish a prima facie case. Then the burden shifts to the employer to state a legitimate, non-discriminatory reason for its action. If the employer provides a legitimate reason, the burden returns to the plaintiff to show that the employer's reason is a pretext for intentional discrimination. Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1193 (11th Cir. 2004).

## A.

In order to establish a prima facie case of disability discrimination, a plaintiff must show that: "(1) she has a disability; (2) she is a qualified individual; and (3) she was subjected to unlawful discrimination because of her disability." Morisky v. Broward County, 80 F.3d 445, 447 (11th Cir. 1996).

First, Calvo must show that she has a disability. Id. One way to demonstrate disability is to establish that the plaintiff has "a physical or mental

5

impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A) (2008). Major life activities include "caring for oneself [and] performing manual tasks," 29 C.F.R. § 1630.2(i). The EEOC regulations provide that a "substantial limitation" occurs when a plaintiff is "[s]ignificantly restricted as to the condition, manner or duration under which . . . [she] can perform [manual tasks or caring for herself] as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(ii). The regulations also instruct us to take into account "(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact . . . from the impairment." Id. at § 1630.2(j)(2).

Despite Walgreens' vigorous arguments to the contrary, Calvo has demonstrated that a genuine issue of material fact exists as to whether she is disabled under the ADA. Since her car accident in 2003, her left arm and hand have been largely useless and are worn in a permanent brace. Calvo's doctor describes this condition as "unable to use L upper extremity." Evidently this condition is permanent; as of 2008 her doctor states that there is nothing more he can do. Calvo's right arm, which was also badly broken in the accident, has

required several surgeries including the insertion and removal of metal pins.  Calvo has provided an affidavit stating that she is unable to dress or undress herself without help, and she also testified that she is unable to shower and wash herself without help.  As for other manual tasks, Calvo's doctors state that she is unable to push, pull, or lift anything heavier than five pounds, and that she also cannot reach above shoulder level, bend, or stoop.

Our cases that reject claims of substantial limitation in the major life activities of manual tasks and caring for oneself involve milder conditions than Calvo's.  In Hillburn v. Murata Elec. NA, 181 F.3d 1220, 1228 (11th Cir. 1999), we held that a plaintiff with coronary heart disease was not substantially limited in the major life activity of manual tasks because she admitted that she was able to bathe, dress herself, work around the house, cook, and work.  Id.  In Chanda v. Engelhard, 234 F.3d 1219, 1222 (11th Cir. 2000), we held that a plaintiff with tendonitis was not substantially limited in the major life activity of manual tasks because he was able to "assist his spouse with household activities, to dress and feed himself, and to drive an automobile," in addition to operating a computer and taking handwritten notes in his classes.  Id.

Calvo's case is more analogous to those in which the plaintiff has lost an entire arm or hand (and possibly is even more severe than those, in light of her

7

weakened right arm and the fact that her useless but painful left arm remains attached). See Gillen v. Fallon Ambulance Serv., 283 F.3d 11, 24 (1st Cir. 2002) (holding that a plaintiff born without one hand could make it past summary judgment on the disability question); Fenney v. Dakota, Minnesota & Eastern R. Co., 327 F.3d 707, 716 (8th Cir. 2003) (holding that a locomotive engineer who had lost his thumb and finger and injured his arm could make it past summary judgment on the disability question based on his limited ability to take care of himself). For purposes of surviving summary judgment, Calvo has shown that she is disabled.

Second, Calvo must show that she is a "qualified individual." Morisky, 80 F.3d at 447. The ADA defines "qualified individual with a disability" as an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that the individual held. 42 U.S.C. § 12111(8). Accordingly, if Calvo is unable to perform an essential function of her job, even with an accommodation, she is, by definition, not a "qualified individual" covered under the ADA. Davis v. Florida Power & Light Co., 205 F.3d 1301, 1305 (11th Cir. 2000).

The key issue here is whether lifting and carrying items heavier than five pounds is an "essential function" of the job of an assistant manager at Walgreens.

8

If so, according to her doctor Calvo cannot perform that essential function, even with accommodation, and thus is not a qualified individual. If not, or if a genuine issue of material fact exists about it, then Calvo is a qualified individual for summary judgment purposes.

42 U.S.C. § 12111(8) states that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and [a pre-written job description] . . . shall be considered evidence of the essential functions of the job." However, the EEOC regulations also provide many other factors that merit consideration, including "[t]he amount of time spent on the job performing the function . . . ; [t]he consequences of not requiring the incumbent to perform the function . . .[t]he work experience of past incumbents in the job." 29 C.F.R. 1630.2(n)(3). In sum, whether a particular function is "essential" to a job is considered on a case-by-case basis, Holly v. Clairston Indus., LLC, 492 F.3d 1247, 1258 (11th Cir. 2007), and although an employer's view is accorded weight, it cannot be conclusive. Id. at 1258 (observing that allowing an employer free reign to decide what an "essential function" is would allow employers to subvert the congressional mandate of the ADA by redefining at will disabled individuals as unqualified ones).

Walgreens staunchly maintains that lifting, pushing, and pulling items

heavier than five pounds is an "essential function" of the assistant manager's job. Walgreens points to its job description for the assistant manager position, which includes: "Receives, stocks, and prices merchandise; maintains stock files and reports." Walgreens also cites the deposition testimony of Calvo's local manager Mario Hernandez, who stated that carrying items was a regular part of the assistant manager's job. Finally, Walgreens cites Calvo's own deposition, in which she acknowledged that her position included "things like cleaning the restrooms and mopping the floors, unloading trucks."

But there is also evidence that lifting and carrying was not an essential function of Calvo's job. The job description cited by Walgreens contains a list of 23 functions, only one of which clearly involves moving items heavier than five pounds. Most of the rest involve record keeping and customer service. Moreover, in citing to Hernandez's testimony that carrying things is important to the assistant manager's job, Walgreens ignores his comments, made just a few moments earlier in the deposition, that after Calvo's accident in 2003 she "couldn't really carry anything that you needed to use two arms with, but she was working fine." Hernandez added twice more that Calvo's performance at her job was "fine" and commented that other employees would help her carry items, and no one ever complained about it. Although Calvo testified that sometimes after her accident

she had engaged in light lifting and carrying at the store, her left arm has been in a brace or cast since 2003. If lifting and carrying were such an essential function of her job, it is surprising that Calvo's manager believed that she was able to perform the job "fine" for a period of four years (with intermittent medical leaves for surgeries). Finally, according to Calvo, regional manager LeCuyer had ordered assistant managers working the afternoon shift, as Calvo did, to refrain from restocking and focus entirely on customer service.

Viewed in the light most favorable to Calvo, there is enough evidence to create a genuine issue of material fact about whether lifting, carrying, and pushing more than five pounds at a time is an "essential function" of an assistant manager at Walgreens. Cf. Holly, 492 F.3d at 1261 (a genuine issue of material fact as to whether punctuality was essential to Holly's job meant that it was "error for the district court to have taken this issue away from the fact-finder and awarded summary judgment to [the employer]."). Therefore, Calvo makes it to the third prong of her prima facie case.

At the third prong, Calvo must show that "she was subjected to unlawful discrimination because of her disability." Morisky, 80 F.3d at 447. It is unlawful discrimination for an employer to fail to provide a reasonable accommodation for a qualified disabled individual. 42 U.S.C. § 12112(b)(5)(A); D'Angelo v. ConAgra

11

Foods, Inc., 422 F.3d 1220, 1225–26 (11th Cir. 2005). Reasonable accommodations may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, . . . and other similar accommodations." 42 U.S.C. § 12111(9)(B). "[T]he ADA may require an employer to restructure a particular job by altering or eliminating some of its marginal functions." Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1260 (11th Cir. 2001).

Calvo asserts that Walgreens failed to reasonably accommodate her when it refused to allow her to return to work. Walgreens responds that her requested accommodations are unreasonable because lifting and carrying are essential functions of the job, and because "employers are not required to transform [a] position . . . by eliminating functions that are essential to the nature of the job as it exists." Lucas, 257 F.3d at 1260. Thus, Walgreens' argument that any accommodation suited to Calvo would be unreasonable hinges on its assertion that lifting and carrying are essential elements of that job. Because there is a genuine issue of material fact as to that question, the same issue exists with regard to the reasonable accommodation prong. Accordingly, Calvo's prima facie case of disability discrimination survives summary judgment.

**B.**

Once a plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged action. See EEOC v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1272 (11th Cir. 2002). Walgreens asserts that it refused to allow Calvo to return to work because she failed to produce a doctor's note that cleared her to do so. Generally a doctor's refusal to release a person to return to work is a legitimate reason for an employer to prevent that person from returning to work. See 42 U.S.C. § 12112(d)(4) (an employer may ask for medical documentation that is "shown to be job-related and consistent with business necessity" and "may make inquiries into the ability of an employee to perform job-related functions"); Collado v. United Parcel Serv., Co., 419 F.3d 1143, 1159 (11th Cir. 2005) (citing with approval UPS' requirement that its diabetic drivers complete a medical program before being allowed to drive trucks); Kincaid v. City of Omaha, 378 F.3d 799, 804–05 (8th Cir. 2004) (stating that the city's requirement that a doctor provide a release prior to an injured person's returning to work was a legitimate, nondiscriminatory reason for refusing to allow a non-released person to work); Revels v. Lucent Tech., Inc., 60 Fed. Appx. 740, 745–46 (10th Cir. 2003) (unpublished) ("The goal of the release requirement—to ensure that returning to work does not hamper recovery—is rational and legitimate.").

13

## C.

After the employer presents a legitimate, nondiscriminatory reason for its action, "the plaintiff must introduce significantly probative evidence that the asserted reason is merely a pretext for discrimination" in order to avoid summary judgment. Brooks v. County Comm'n of Jefferson County, 446 F.3d 1160, 1163 (11th Cir. 2006) (quotation and alteration omitted). A plaintiff may show pretext by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's proffered reason, id. at 1163, or by producing other evidence "which permits the jury to reasonably disbelieve the employer's proffered reason." Steger v. General Elec. Co., 318 F.3d 1066, 1079 (11th Cir. 2003). "Any believable evidence which demonstrates a genuine issue of fact regarding the truth of the employer's explanation may sustain the employee's burden of proof" on this point. Id.

Calvo argues that the note she provided to LeCuyer in February 2006 did allow her to return to work. She concedes that the doctor's note dated January 31 left unchecked the box next to the statement "To regular occupation," and instead checked the box next to the statement "To any other occupation." The note also says that the doctor expects "possible MMI [maximum medical improvement] in the next 6 – 8 months."

14

Calvo focuses, however, on the rest of the note and on the surrounding circumstances. She points out that the doctor also checked "yes" under "Have you advised patient to return to work," and the note adds that "Patient can work a total of 8 hours per day." The doctor rated Calvo as able to sit, stand, and walk for 8 hours continuously. The doctor then described Calvo's condition as "unable to use L upper extremity," and accordingly restricted her from "lifting, carrying, pushing or pulling anything over 5 lbs."

Calvo interprets that note as allowing her to return to work. She argues that Walgreens' refusal to accept it amounts to the company seeking a formalistic way to justify getting rid of her. Calvo notes that she had worked her job at Walgreens for several years already after her left arm became immobilized and largely useless. Thus, the only reason that the doctor gave for her restrictions— that she was unable to use her upper left extremity— was nothing new. She reiterates that the doctor listed her return-to-work date as February 6, 2006, and that Walgreens should have allowed her to return then.

Additionally, Calvo explains that before February 2006 Walgreens had allowed her to return to work despite doctors' notes that were less enthusiastic than her January 2006 note. In April 2005, Calvo returned to work although a doctor's note dated April 15 stated that the doctor did not advise her returning to work,

15

described her condition as "severe injury to both arms/hands" and wrote "unknown" after "Do you expect improvement in any area." A follow-up note dated May 4 provided that Calvo could return to work, but added "light duty has restriction with B upper extremities," and "unable to use L upper extremity." That description of Calvo's condition is substantially similar to the one given by the January 2006 note, yet Walgreens allowed to her to work in April and May 2005, but not in January 2006.

Calvo has raised a genuine issue of material fact as to Walgreens' asserted reason for refusing to accommodate her. At this stage of the proceedings, Calvo has demonstrated that Walgreens' reason may prove weak and implausible. After all, it hinges on one check mark missing from a box on a two-page form that includes several specific handwritten statements that seem to fully set out the doctor's views about the scope of Calvo's abilities. A jury could interpret the overall note as meaning that the doctor had released Calvo to any job in which her specific restrictions about lifting and carrying were observed. Viewing the doctor's note and her work history in the light most favorable to Calvo, she has produced evidence which could permit a jury to disbelieve Walgreens' stated reason for refusing to allow her to work. See Steger, 318 F.3d at 1079. Thus, a genuine issue of material fact exists on this point.

Accordingly, the district court erred when it granted summary judgment against Calvo's claim of disability discrimination under the ADA.

**IV.**

Calvo also makes retaliation claims. The law provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA]." 42 U.S.C. § 12203(a).

First, Calvo asserts that Walgreens' failure to accommodate her upon her request amounted to retaliation under 42 U.S.C. § 12203(a). That assertion misunderstands the statute. As we observed in Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1288 (11th Cir. 1997), discrimination on the basis of disability is different from retaliation on the basis of opposing unlawful practices or filing a charge against the employer. In Stewart, we refused to address the plaintiff's "retaliation" claims that were based on simple refusals to accommodate her. We stated that "[i]n our view, the acts Stewart describes relate directly to her 'reasonable accommodation' discrimination claim, not her retaliation claim." Id. at 1288. See also Lucas, 257 F.3d at1261 (rejecting a retaliation claim based on a failure to reasonably accommodate because it "merely reclothes Lucas' ADA discrimination claim"). In other words, the gist of Calvo's

17

discrimination claim is that Walgreens refused to accommodate her because of her disability. Walgreens did not refuse to accommodate Calvo because she requested accommodation. Cf. CBOCS West, Inc. v. Humphries, 128 S. Ct. 1951, 1964 (2008) (Thomas, J., dissenting) (observing that discrimination is based on status, while retaliation is based on action).

Calvo makes one retaliation claim that merits further analysis. She asserts that LeCuyer harassed her by asking her for medical documentation in January 2006. Calvo argued that LeCuyer had never personally requested medical documents before and that her earlier doctors' notes, which had been accepted, were simply faxed to Walgreens' insurer.

But even assuming, as the district court did, that Calvo can make a prima facie case of retaliation, she has provided no evidence that Walgreens' proffered reason for LeCuyer's action is pretextual. Walgreens explains that LeCuyer asked Calvo for medical documentation as a routine matter, to ensure that she was cleared by a doctor to return to work. This is a perfectly acceptable explanation. See 42 U.S.C. § 12112(d)(4); Collado, 419 F.3d at 1159; Kincaid, 378 F.3d at 804–05. Walgreens adds that during Calvo's earlier leaves of absence, her individual store managers had been able to cover for her. However, during her last absence, from November until February 2006, her assigned store had requested a

18

replacement for Calvo, which meant that LeCuyer needed to re-assign Calvo upon her return. For that reason, LeCuyer became involved in Calvo's situation and personally requested her doctor's note. Calvo has presented no evidence that this explanation is pretextual.

Accordingly, we affirm the district court's grant of summary judgment in favor of Walgreens on Calvo's retaliation claims.

**AFFIRMED IN PART, REVERSED AND REMANDED IN PART.**