**UNPUBLISHED ORDER**
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted August 2, 2006[*]
Decided August 2, 2006

**Before**

Hon. RICHARD D. CUDAHY, *Circuit Judge*

Hon. KENNETH F. RIPPLE, *Circuit Judge*

Hon. DIANE S. SYKES, *Circuit Judge*

No. 06-1914

| | |
|---|---|
| DEBORAH WALTON,<br> *Plaintiff-Appellant,*<br><br> *v.*<br><br>CLAYBRIDGE HOMEOWNERS<br>ASSOCIATION, INC., et al.,<br> *Defendants-Appellees.* | Appeal from the United States District Court for the Southern District of Indiana, Indianapolis Division<br><br>No. 1:03-cv-00069-LMJ-WTL<br><br>Larry J. McKinney,<br>*Chief Judge.* |

**O R D E R**

Deborah Walton sued her homeowners' association and several of her neighbors, claiming that they violated her rights under the Fair Housing Act, 42 U.S.C. §§ 3601-3631, by harassing her on account of her race. The district court granted summary judgment for the defendants. We affirm.

Walton has sparred with the Claybridge Homeowners Association and a number of neighborhood residents ever since she bought a home in a subdivision

---

[*] After examining the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* Fed. R. App. P. 34(a)(2).

managed by the Association in Carmel, Indiana, in early 2000. Walton's disputes with her neighbors and the Association have spawned much federal and state litigation besides the matter now before us. *See Walton v. Rubin & Levin P.C.*, No. 1:05-cv-01132-LJM-VSS (S.D. Ind. filed Aug. 1, 2005); *Walton v. City of Carmel*, No. 1:05-cv-0902-RLY-TAB (S.D. Ind. filed June 15, 2005); *Walton v. Proffitt*, 1:04-cv-02028-LJM-WTL (S.D. Ind. filed Dec. 14, 2004); *Walton v. First Am. Title Ins. Co.*, 844 N.E.2d 143 (Ind. App. Ct. 2006); *Walton v. Claybridge Homeowners Assoc., Inc.*, 792 N.E.2d 104 (Ind. Ct. App. 2003). In the lawsuit underlying this appeal, which Walton filed in January 2003 with the assistance of counsel, she alleged that the Association and eleven residents of her predominantly white subdivision have harassed her since she moved in because she is black. Walton claimed that their conduct violated § 818 of the Fair Housing Act, *see* 42 U.S.C. § 3617, which, as relevant here, makes it unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of" rights protected under the Act. The defendants initially moved to dismiss Walton's complaint for failure to state a claim because, they argued, the Fair Housing Act is concerned with discriminatory activity intended to thwart home purchases and provides no cause of action under § 3617 or any other section for post-acquisition harassment. At that time we had not spoken about the viability of a claim for post-acquisition discrimination, and the district court, relying on precedent from outside the circuit, held that § 3617 does prohibit racial harassment after a home purchase. The court thus denied the defendants' motion to dismiss, and the suit proceeded. After discovery the defendants moved for summary judgment.

Walton clarified the alleged harassment in her affidavit submitted with her opposition to the defendants' motion for summary judgment. The first incident started with an unsolicited quote for lawn-care services that Walton received in her mailbox in February or March 2000. She called the company for an explanation, and the owner told her that the Association wanted to "get rid of her" because she was a renter. Walton then called defendant Greg Boyd, the president of the Association, to confront him with this information. According to Walton, Boyd said that she was "not supposed to be told" what the owner of the lawn-care business had communicated.

The next incidents occurred almost a year later, toward the end of 2001, and involved the Association's use of certain easements on Walton's lot. A speed-limit sign was initially placed near the house of defendant Terri Gregg, who is white, but when Gregg asked for it to be moved, it was placed on a utility easement located by Walton's house. When Walton asked for the sign to be moved, the Association refused. Walton then moved the sign herself, and the Association sued in state court to enjoin her from interfering with the sign. Walton, whose residence is at the entrance of the subdivision, also complained to the Association about the location and maintenance of a brick wall identifying the subdivision and a decorative

wooden fence, both of which sit on her property. The Association told her that the structures and related landscaping are on its easement and that it had the right to maintain them. The Association nevertheless hired surveyors to confirm that the wall and fence were within its easement. According to Walton, when the surveyors arrived she went outside, and they yelled at her to go back into her house. She called the police. The dispute led the Association to seek an injunction prohibiting Walton from interfering with the location and maintenance of the wall and fence. Walton avers in her affidavit that a white family living across the street has a corresponding wall and fence on its property but has never been sued by the Association. Ultimately, the Association won its lawsuit against Walton and obtained a permanent injunction against her.

The last major incident occurred in the fall of 2002 when the Association hired workers to put down mulch in the neighborhood. When they approached Walton's property there was an altercation, and she ordered them to leave. The altercation was witnessed by a landscaper working in Walton's yard, and by defendant Mary Louise Spellmeyer, an Association board member who happened to be there. The landscaper testified by affidavit that, as he was leaving, Spellmeyer walked by him and said, "There is more than one way to lynch a nigger."

These three sets of incidents spread over the course of around 30 months are the focus of Walton's harassment claim. The other neighborhood residents named as defendants—Tolliver, Corydon, Bartley, Van Tassel, Carriger, Freeman, Gould, and Sullivan—are named only in the caption of Walton's complaint and are not again mentioned in any of her submissions. And though Walton listed other grievances, few of them implicate the Association or any other defendants. Walton says, for example, that trash was constantly left in her yard and mailbox. One night she heard a noise and looked out her window to see Gregg picking up wet newspapers from the street and throwing them in Walton's yard. Another time a neighbor not named in this lawsuit called the police on Walton when someone dumped mulch on the street near her property. The police were called to her house on other occasions, but Walton does not know who made the calls. She also avers that the Association stopped sending her newsletters because they mentioned the ongoing litigation between her and the Association, and she blames the Association for the removal of her trash cans.

At summary judgment the defendants renewed their argument that § 3617 (through 42 U.S.C. § 3613(a), the provision creating a private cause of action) does not provide for a claim of post-acquisition discrimination. By this point we had addressed the scope of § 3617, and we held that it literally provided a cause of action only for plaintiffs who complain about discrimination in acquiring, rather than simply enjoying, property. *See Halprin v. Prairie Single Family Homes of Dearborn Park Assoc.*, 388 F.3d 327, 328-30 (7th Cir. 2004). We noted, however,

that the Department of Housing and Urban Development had issued a regulation interpreting § 3617 to include post-acquisition discrimination as within the range of conduct prohibited by the Fair Housing Act. *Id.* at 330. That regulation forbids "threatening, intimidating or interfering with persons in their enjoyment of a dwelling because of the race, color, religion, sex, handicap, familial status, or national origin of such persons." 24 C.F.R. § 100.400(c)(2). In two cases we have observed that the regulation may be invalid insofar as it strays from what is expressly covered by § 3617, but in neither instance did we explore the issue because the defendants in both cases waived it. *See Halprin*, 388 F.3d at 330; *East-Miller v. Lake County Highway Dep't*, 421 F.3d 558, 562 n.1 (7th Cir. 2005). Picking up on our observation, the defendants argued in the district court that § 100.400(c)(2) impermissibly expands the scope of § 3617 by purporting to cover post-acquisition discrimination. The district court disagreed but granted summary judgment anyway because Walton had failed to provide a genuine issue of material fact for trial.

Walton argues on appeal that there is a genuine issue of material fact about whether the defendants violated her rights under the Fair Housing Act. The defendants, like those in *Halprin* and *East-Miller*, have waived any challenge to the validity of § 100.400(c)(2) on appeal by not raising it. *Hentosh v. Herman M. Finch Univ. of Health Scis./Chi. Med. Sch.,* 167 F.3d 1170, 1173 (7th Cir. 1999). Instead they contend that Walton has failed to identify any specific shortcoming in the district court's analysis and thus has waived any objection to the adverse decision at summary judgment. With respect to Tolliver, Corydon, Bartley, Van Tassel, Carriger, Freeman, Gould, and Sullivan, the problem is more a failure of proof than waiver. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986) (noting that plaintiff must offer affirmative evidence to defeat summary judgment); *Tri-Gen Inc. v. Int'l Union of Operating Eng'rs, Local 150, AFL-CIO*, 433 F.3d 1024, 1038 (7th Cir. 2006) (same). Walton offered no evidence concerning these defendants, and so their dismissal at summary judgment was a foregone conclusion, as is the outcome of this appeal with respect to them. But Walton did present evidence as to Boyd, Gregg, Spellmeyer, and the Association, and as to these defendants Walton has said enough in her brief, which she filed pro se, to have preserved her argument for appeal. *Cf. Anderson v. Hardman*, 241 F.3d 544, 545 (7th Cir. 2001).

We review the district court's grant of summary judgment de novo. *East-Miller*, 421 F.3d at 561. To prevail under § 3617 Walton must show that: (1) she is a protected individual under the Fair Housing Act; (2) she was engaged in the exercise or enjoyment of her housing rights; (3) the defendants were motivated in part by an intent to discriminate; and (4) the defendants coerced, threatened, intimidated, or interfered with her on account of her activity protected under the Act. *Id.* at 562-63. Since no one disputes that Walton has met the first two elements, she begins her argument by focusing on the third.

But Walton failed to present any direct evidence from which a jury could conclude that Boyd, Gregg, or the Association engaged in intentional discrimination. We have recently emphasized that a party wishing to avoid summary judgment must present *some* evidence from which a jury could rationally infer that the events complained of are motivated by intentional discrimination. *See id*. at 564. No evidence suggests that the quote from the lawn-care service or Boyd's response to it were motivated by racial discrimination. In fact, Walton herself understood that Boyd "wanted to get rid of her" because he thought she was a renter rather than a homeowner. Nothing in the record even alludes to a racial motivation for the Association's legal action against her; again, she admitted that the impetus for the legal action was her interference with the Association's easements. No evidence was offered to show that Gregg threw wet newspapers in Walton's yard because of her race, or that intentional discrimination lay behind the Association's decisions not to send her a newsletter or to have her trash cans removed. And Walton cannot even say who was responsible for the "numerous occasions" that police were called to her house, or for leaving trash in her yard and mailbox.

The direct method, though, is not the only way to prove intentional discrimination under the Fair Housing Act; a party can use the indirect, burden-shifting method articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *East-Miller*, 421 F.3d at 563 (citing *Kormoczy v. Sec'y, U.S. Dep't of Hous. and Urban Dev. ex rel. Briggs*, 53 F.3d 821, 823-24 (7th Cir. 1995)). Walton invokes that method here by offering evidence that the Association pursued legal action against her but not against her white neighbors. To create an inference of discrimination under *McDonnell Douglas*, Walton had to show that her white neighbors were similarly situated and treated more favorably. *See Ballance v. City of Springfield,* 424 F.3d 614, 617 (7th Cir. 2005) (articulating similarly situated requirement in Title VII context). This she has not done. The Association sued Walton over the wall and fence, but the reason is obvious: the defendants offered uncontradicted evidence that Walton interfered with the Association's easements by attempting to dismantle the wall and preventing the Association from maintaining the fence. There is nothing in the record, however, even hinting that Walton's neighbors interfered with the Association's easements on their lot, so they are not similarly situated. *See Radue v. Kimberly-Clark Corp.,* 219 F.3d 612, 617-18 (7th Cir. 2000) (providing that "similarly situated" means that individuals "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct"). Without such evidence we cannot infer that pursuing legal action against her was discriminatory. *See Goodwin v. Bd. of Trs. of Univ. of Ill.*, 442 F.3d 611, 618 (7th Cir. 2006) (refusing to infer intentional discrimination from treatment of employees who were not similarly situated to plaintiff).

We are left with Spellmeyer's purported comment that "there is more than one way to lynch a nigger." Spellmeyer denies making the statement, but, again, the procedural posture of this case requires us to construe disputed facts in Walton's favor. Walton argues that the phrase is so offensive that it is inherently coercive or intimidating, especially when coupled with Spellmeyer's position on the Association's board. The defendants call the remark a stray one and argue that the statement does not rise to the level of coercion, interference, or intimidation necessary to sustain a claim under § 3617. We noted in *East-Miller* that racial slurs can create an inference of race discrimination. 421 F.3d at 563. But we have also emphasized that, in determining whether conduct violates § 3617, there is a difference between a pattern of and an isolated act of harassment. *Halprin*, 388 F.3d at 330. In *Halprin* we held the plaintiff's complaint sufficient to survive a motion to dismiss because the allegations that the homeowners' association waged a campaign of harassment against the plaintiff on account of his religion presented the type of pattern that could violate § 3617. *Id.* In another case, however, we held that a landlord's sexual proposition coupled with caressing his tenant was a single act of harassment that could not create a hostile housing environment. *Dicenso v. Cisneros*, 96 F.3d 1004, 1008-09 (7th Cir. 1996). As in *Dicenso*, Walton cannot prevail at trial on Spellmeyer's remark alone. Although Walton attempts to connect Spellmeyer's remark to the actions of the Association by noting her board membership, we have held that a stray remark must have "some nexus" to the challenged action. *See Scaife v. Cook County*, 446 F.3d 735, 741 (7th Cir. 2006). The remark here is simply too attenuated from any of the Association's actions.

In *Halprin* we anticipated a case like Walton's, and we recognized that an isolated racial or religious slur made in the context of a neighborhood quarrel does not a federal discrimination case create. 388 F.3d at 330. Accordingly, we AFFIRM the grant of summary judgment for the defendants.