**Patricia BONE and Dorothy Capezza, Plaintiffs,**

v.

**The VILLAGE CLUB, INC., et al., Defendants.**

**Case No: 8:15–cv–579–T–36AEP**

United States District Court, M.D. Florida, **Tampa Division.**

Signed 10/12/2016

---

55. Doc. 28–5.

57. Doc. 28–2.

Marcy LaHart, Gainesville, Robert N. Hartsell, Pompano Beach, FL, for Plaintiff.

Daniel F. Pilka, Pilka & Associates, PA, Brandon, FL, for Defendant.

## ORDER

Charlene Edwards Honeywell, United States District Judge

This matter comes before the Court upon three motions for summary judgment: (1) Defendants' Motion for Partial Summary Judgment as to Plaintiff Capezza's claims (Doc. 57), to which Capezza has responded in opposition (Doc. 66), and to which Defendants have replied (Doc. 76); (2) Defendants' Second Motion for Partial Summary Judgment as to Capezza's claims for punitive damages (Doc. 67), to which Capezza has responded in opposition (Doc. 77); and (3) Plaintiffs' Motion for Summary Judgment (Doc. 68), to which Defendants have responded in opposition (Doc. 89), and to which Plaintiffs have replied (Doc. 91). The Court having considered the parties' submissions, including depositions and declarations, and being fully advised in the premises, will DENY the Motions.

## I. Background and Statement of Facts [1]

Plaintiffs Charles Smith and Dorothy Capezza initiated this action for violations of the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601, *et seq.*, against Defendants The Village Club, Inc., d/b/a Brookhaven

---

1. The Court has determined the facts based on the parties' submissions, including depositions, declarations and other exhibits.

Village, Inc. ("Brookhaven") and five members of Brookhaven's board of directors: Jim Rubert, John Berndt, Joyce Burton, Mickie Crittenden, and Tammy Walker. Doc. 39 at ¶¶ 5–11. Plaintiff Smith died after this action was filed. Doc. 43. The Court stayed all case management deadlines as to Smith, pending the substitution of parties. Docs. 63, 64. Patricia Bone, as personal representative of the Estate of Charles Smith, was substituted as a plaintiff in this action in place of Charles Smith. Doc. 106. Accordingly, Plaintiffs' Motion for Summary is denied to the extent that it requests summary judgment on behalf of Plaintiff Charles Smith[2]. The following facts relate to Plaintiff Capezza and her claims against Defendants.

In December 2013, Capezza bought land in Brookhaven Village, a mobile home community in Winter Haven, Florida. Doc. 68–8, "Capezza Dep." at 19, 34. Before buying land, Capezza spoke with Frank Nutter, who was the president of Brookhaven's board of directors at the time. Id. at 17; Doc. 68–4, "Capezza Dec." at ¶ 4. Capezza told Nutter that she had a small dog named Buttons that helped her cope with her anxiety. Capezza Dec. at ¶ 4. Capezza asked Nutter what she needed in order to have Buttons approved to live with her. Id. Nutter told Capezza that she needed to provide documentation that Buttons was licensed and up-to-date on his vaccines, as well as a note from her doctor verifying that she needed the dog. Id. at ¶ 5. According to Capezza, she provided everything that Nutter asked for, and Nutter told her that she had been approved by the board to have her dog. Id.; Capezza Dep. at 19.

Defendant Tammy Walker, who testified as Brookhaven's corporate representative, stated that she had no reason to believe that Capezza lied about having permission to live with Buttons, and she never asked Nutter whether he gave Capezza permission to have an emotional-support animal. Doc. 68–6, "Walker Dep." at 5, 36. David Milne, who was a member of the board of directors and the board's secretary at the time, confirms that Capezza was approved to live with her dog even though she was purchasing a lot in the "no pet" section of Brookhaven Village. Doc. 68–5, "Milne Dec." at ¶ 7. According to Milne, Nutter provided documents from Capezza that certified her need to live with her dog because of her disability. Id. at ¶ 5. Because the documents included medical information, Milne kept the documents in a locked cabinet at the Brookhaven clubhouse. Id. at ¶ 6.

Approximately one year after Capezza bought her land, Brookhaven's attorney, Daniel Pilka, sent Capezza a letter dated December 3, 2014, which stated: "I have been requested by the Board of Directors of the Brookhaven Village to request that you immediately take actions to remove the dog that you currently have living with you at your home." Doc. 1 at ¶ 39; Doc. 20 at ¶ 39; Doc. 1–9 at 2. Pilka cited Article V, Section 6 of Brookhaven's Declarations of Covenants, Restrictions, Limitations, Conditions, Charges and Uses ("Declarations"), which provided, in relevant part, that: "no pet shall be kept, bred, or maintained for any purpose in any portion of The Property not the designated Pet Section[.]" Doc. 1–9 at 2. The letter further stated:

> Because your unit is not located within the designated "Pet Section," you are violating your Declarations of Covenants and Restrictions by continuing to keep your pet.

2. Upon the substitution of parties, the Court reopened the period of discovery and extend-

ed the dispositive motion deadline as to Plaintiff Patricia Bone. *See* Doc. 106.

As a result, in order to avoid the possibility of legal actions being initiated against you, it is requested that you immediately remove your dog from your premises. You will have thirty (30) days to accomplish this.

Should you not heed the warning contained in this letter, then the Association will have to take further actions in order to enforce its Rules and Regulations, including the possible initiation of legal actions against you.

*Id.* at 3.

By letter dated December 17, 2014, Capezza responded to Pilka and the board of directors as follows:

I am writing concerning the letter I received about my dog. When I bought my land in here I was told by Frank Nutter, the President of the board that I was approved by board members Ken Alexander, David Milne, Jerry Luedika, and Frank Nutter to have my dog. My doctor had provided a letter stating my need for my dog which provides support for my severe anxiety.

Since receiving your letter, my anxiety has worsened and my doctor has written another note stating my need for my dog for support. My dog is sick and has cancer. I was told by the veterinarian that he only has a short time to live. The thought of having to get rid of my dog at the greatest time of his need is making me ill.

I intend to contact federal and state agencies that will help me resolve this matter should I continue to be harassed by the Brookhaven Village Board. I was promised before I even moved in that I could have my dog, otherwise, I would not have bought a lot here.

Doc. 1 at ¶ 40; Doc. 20 at ¶ 40; Doc. 1–10 at 2. Capezza provided two prescriptions from her doctor, Preeti Harchandani, M.D. Doc. 57–1. The first, dated December 3, 2013, stated: "Pt needs to keep her dog for companionship due to anxiety issues." The second, dated December 10, 2014, stated: "Ms. Capezza needs her dog for emotional well being and support." *Id.*

By letter dated December 31, 2014, Pilka responded to Capezza's December 17, 2014, letter. In relevant part, Pilka stated:

To the extent that you are seeking an exception to Brookhaven Village's Rules and Regulations, the Brookhaven Village Board of Directors has an obligation and duty to balance your rights against the rights of all the other homeowners within the community. As a result, in protecting everyone's legal rights, the Brookhaven Village Board of Directors must have the opportunity to fully investigate your assertions and request for exemption from the Association's Rules and Regulations. Accordingly, on behalf of Brookhaven Village Board of Directors, I am submitting the following request for information in order to substantiate your claim:

1. Produce medical records, reports and/or documents to demonstrate that you are suffering from a medical disability or handicap that has been diagnosed by a healthcare provider, unless your medical disability or handicap is readily ascertainable. Your privacy rights will be fully protected and the records will not be copied or shared with any third parties. Rather, the Bookhaven [*sic*] Village Board of Directors will simply review the records at a regularly scheduled meeting the return them to you promptly.

2. Demonstrate how this emotional service animal reasonably accommodates your medical or psychiatric disability or handicap. This would include providing a copy of the prescription written by a healthcare provider.

3. Demonstrate that the emotional service animal has special skills or training to accommodate your medical disability or handicap. This would include providing any certification that the animal has received which notes its training as a service animal or emotional support animal.

4. Demonstrate how the special skills or training of the service animal or the emotional support animal set it apart from an ordinary pet.

While you may consider these requirements to be onerous, I can assure you that they constitute a reasonable accommodation for handicapped or disabled individual [*sic*] that fairly balance [*sic*] Brookhaven Village's responsibilities to enforce its Rules and Regulations, with its required compliance with the Americans with Disabilities Act and both the Federal and State Fair Housing Acts, and thus will be handle [*sic*] as a violation of Brookhaven Villages' Rules and Regulations. Therefore, I urge your immediate compliance with this request.

Doc. 57–2 at 1–2.

Six days later, by letter dated January 6, 2015, Pilka sent Capezza a "STATUTORY OFFER TO PARTICIPATE IN PRE–SUIT MEDIATION." Doc. 57–4. Pilka informed Capezza that his law firm assisted Brookhaven with enforcing its Declarations. *Id.* at 1. Pilka then stated: "The Association hereby demands that Dorothy A. Capezza engage in mandatory pre-suit mediation in connection with the following disputes which, by statute are the type that are subject to mediation." *Id.* Pilka quoted the no-pet provision of Article V, Section 6 of the Declarations and continued:

In the past you have received numerous requests from the Association to bring your property into compliance by submitting an application and documenta-

tion for the dog you are keeping at your property. Yet, despite numerous requests to remedy these situations by your Association and by its Property Manager, you went ahead without submitting an Application and documentation for the Board to review and approve. These requests have been totally ignored by you and as a result your property has been referred to our firm for legal action.

Accordingly, pursuant to Florida Statute § 720.311, this demand to resolve this dispute through pre-suit mediation is required before a lawsuit can be filed concerning this dispute. Pursuant to the statute, the parties are required to engage in pre-suit mediation with a mutual third party mediator in an attempt to resolve this dispute without court action, and the aggreived [*sic*] party demands that you likewise agree to this process. If you fail to participate in the mediation process, suit may be brought against you by the Association without further warning.

*Id.* at 2. After explaining the mediation process, Pilka informed Capezza that she would be required to share half the cost of pre-suit mediation. *Id.* at 2–4. Pilka further stated:

In the event that you fail to respond within 20 days from the date of this letter, or if you fail to agree to at least one of the mediators that we have suggested or to pay or pre-pay to the mediator one-half of the cost involved, the Association will be authorized to proceed with the filing of a lawsuit against you without further notice, and may seek an award of attorney fees or costs incurred in an attempt to obtain mediation.

*Id.* at 4. Capezza believed that this letter meant that Brookhaven was suing her or was going to sue her. Capezza Dep. at 69.

Although Buttons died on February 13, 2015, Capezza wants to obtain another emotional-support animal. Capezza Dec. at ¶ 7. By letter dated February 20, 2015, Capezza's counsel, Marcy LaHart, responded to Pilka. Doc. 1–5 at 2–7. Among other points, LaHart contended that Brookhaven was not entitled to weigh Capezza's interests "against" the other homeowners, that Brookhaven was not entitled to inquire as to the severity of Capezza's disability or to request her medical records, and that emotional support animals are not required to have special skills or training. *Id.* at 2–6. The letter closed as follows:

> I am hopeful that this matter can be worked out without further escalation. I would appreciate prompt confirmation that my clients will not be further hassled by you or the association regarding their dogs. If you have an objective reason to doubt that there is a legitimate need for an accommodation, please let me know and we can begin the interactive process to provide you verification within the parameters [the U.S. Department of Housing and Urban Development] and courts have established regarding the appropriate scope of inquiry that can be made by a housing provider.

*Id.* at 7.

At a board meeting on February 23, 2015, the individual defendants voted to enforce the Declarations against Plaintiffs. Doc. 68–1, "Shimunek Dec." at ¶¶ 10–11; Doc. 39 at ¶¶ 78, 98, 109, 120, 131; Doc. 40 at ¶¶ 78, 98, 109, 120, 131. According to Judy Shimunek, who was Plaintiff Smith's companion, "After the meeting adjourned [Defendant] Jim Rubert approached us and stated 'Did you know that saying your dog is a service dog when it is not is a Class D felony punishable by $50,000? I have checked with other attorneys in addi-

tion to our attorney who have verified this.'" Shimunek Dec. at ¶ 12.

On February 24, 2015, Pilka and LaHart communicated by e-mail. Pilka stated: "[C]an I assume from your silence that you and your other clients are unwilling to submit to pre-suit mediation pursuant to F.S. sec. 720.311?" Doc. 77–1 at 7. LaHart responded:

> My clients should not have to lawyer up and pay for a mediator to obtain an accommodation for an assistance animal. In fact the process should be simple and should not be intrusive. If Brookhaven wishes to pay for my time to come to Winter Haven and foot the bill for the mediator, I will ask my clients to participate. I hope I have made myself very clear that my clients are willing to provide the association the verification to which it is entitled by law, but serving a demand for pre-suit mediation is NOT engaging in the interactive process.

*Id.*

Other than providing the two prescriptions from Dr. Harchandani, Capezza did not provide any other documentation to Brookhaven because, as she explained during her deposition:

> I didn't have to do anything more than that was asked of me. . . . That's what I felt. There was no need to go to a new board and start all over again. I can't handle it. I'm going to be very honest with you. I really can't handle it.

Capezza Dep. at 38–39. She also testified, "I did not feel as though my medical records were that important to anybody but me. They're personal. They belong to me. If you want them, then you're going to have to subpoena them." *Id.* at 62.

Plaintiffs filed this action on March 16, 2015. Doc. 1. Plaintiffs filed an Amended Complaint on November 12, 2015, which asserts claims under the FHA for failure-

to-accommodate against Brookhaven (Count I) and each of the individual defendants (Counts III, V, VI, VII, VIII), as well as claims for intimidation against Brookhaven and Rubert (Counts II and IV). Plaintiffs seek compensatory and punitive damages, declaratory and injunctive relief including a waiver of the no-pet policy, and attorneys' fees and costs. *Id.* at 28–29 & ¶¶ 67, 72, 83, 92, 103, 114, 125, 136. The parties now move for summary judgment as to Defendants' liability on each of the eight claims. Doc. 57, Doc. 68. Defendants separately move for summary judgment on Capezza's entitlement to punitive damages. Doc. 67.

## II. Standard of Review

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324, 106 S.Ct. 2548. Issues of fact are genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48, 106 S.Ct. 2505. A fact is "material" if it may affect the outcome of the suit under governing law. *Id.* at 248, 106 S.Ct. 2505. In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Id.* at 255, 106 S.Ct. 2505.

## III. Discussion

### A. Failure-to-accommodate claims

 The Fair Housing Act prohibits discrimination in the provision of housing based on a person's disability and other protected characteristics.[3] 42 U.S.C. § 3604(f). Pursuant to the FHA, discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). To prevail on a failure-to-accommodate claim, a plaintiff must establish that: (1) she is a person with a disability within the meaning of the FHA or a person associated with that individual, (2) she requested a reasonable accommodation for the disability, (3) the requested accommodation was necessary to afford the plaintiff an opportunity to use and enjoy the dwelling, and (4) the

---

**3.** Although the FHA refers to discrimination based on "handicap," disability scholars generally prefer the term "disability." *Bhogaita v.*

*Altamonte Heights Condo. Ass'n, Inc.,* 765 F.3d 1277, 1285 n.2 (11th Cir. 2014).

defendant refused to make the accommodation. *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1225 (11th Cir. 2016).

### 1. Disability

The FHA defines disability as: "(1) a physical and mental impairment which substantially limits one or more ... major life activities, (2) a record of having such impairment, or (3) being regarded as having such impairment[.]" 42 U.S.C. § 3602(h). A "physical and mental impairment" includes any "mental or psychological disorder, such as ... emotional or mental illness." 24 C.F.R. § 100.201(a)(2). "Major life activities" are "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 24 C.F.R. § 100.201(b). In interpreting the FHA's definition of disability, courts look to cases interpreting the former version of the Americans with Disabilities Act ("ADA"), which included a "virtually identical" definition of disability.[4] *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1287–88 (11th Cir. 2014).

■ Capezza maintains that she has an actual disability, under the first prong of 42 U.S.C. § 3602(h), based on "a history of suffering from major depression, anxiety and hypertension." Doc. 68 at 17. As her sole support for this argument, Capezza cites to a declaration from her expert witness, Dr. Erika Friedmann. *Id.*; Doc. 68–3, "Friedmann Dec."

Dr. Friedmann reviewed Capezza's progress notes from twenty-five visits with Dr. Harchandani between 2010 and 2015, and she also interviewed Capezza on the telephone. Friedmann Dec. at ¶ 3. Dr. Friedmann opines that Capezza has the mental impairments of major depression and anxiety, which "impact her cognition, her ability to work, care for herself and otherwise carry out daily life activities." *Id.* at ¶ 2. Dr. Friedmann explains that Capezza's depression and anxiety "are characterized by a lack of interest in others and in social interaction, difficulty getting out of bed, difficulty in taking care of herself and of her living environment, and difficulty leaving the house," as well as "difficulty sleeping." *Id.* at ¶ 11. Following the death of Buttons, Capezza "spends most of the day sitting in front of the TV or reading," and she no longer goes bowling, goes to the gym, or take walks three times a day. *Id.*

■ Defendants argue that Dr. Friedmann's expert report was untimely disclosed and her opinion is therefore inadmissible. Doc. 89 at 3. The Federal Rules provide that, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); Fed. R. Civ. P. 26(a)(2).

Capezza provides no justification for her failure to timely disclose Dr. Friedmann's report; she admits that the failure was "inadvertent." Doc. 91 at 4. Nonetheless, pursuant to Defendants' request, this Court extended the discovery deadline as well as the deadline for disclosure of Defendants' expert reports. Doc. 49 at ¶¶ 4–5; Doc. 53. Defendants were able to depose Dr. Friedmann four weeks before Defendants filed their response in opposition to Capezza's Motion for Summary Judgment.

---

4. The ADA Amendments Act of 2008 ("ADAAA") became effective on January 1, 2009. *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1267 (11th Cir. 2014). The ADAAA and its implementing Regulations aimed to correct what Congress viewed as "an inappropriately high level of limitations necessary to obtain coverage under the ADA." *Id.* at 1269 (internal quotation marks omitted).

Doc. 88 at 1; Doc. 89. Because Defendants had the opportunity to obtain their own expert and to depose Dr. Friedmann, the Court finds that Defendants were not prejudiced by the untimely disclosure of Dr. Friedmann's report. *Cf. Walter Int'l Prods., Inc. v. Salinas*, 650 F.3d 1402, 1412–13 (11th Cir. 2011) ("it is harmful to deprive opposing counsel of the expert's report before his deposition").

Defendants alternatively argue that they did not have the benefit of Dr. Friedmann's opinion, or the benefit of reviewing any of Capezza's medical records other than the two prescriptions written by Dr. Harchandani, at the time Capezza requested an accommodation. Doc. 89 at 4–6. In particular, Defendants appear to contend that they are entitled to summary judgment because Capezza's disability, if any, was not known to them. *Id.* at 4. In support of that argument, Defendants' proposed expert, Curtis Cassidy, M.D., opines that the two prescriptions were not sufficient to demonstrate that Capezza suffered from a disability. Doc. 89–2 at ¶¶ 8–10.

As discussed below, Defendants' knowledge regarding Capezza's medical conditions is relevant to other elements of Capezza's failure-to-accommodate claims. *See, e.g., Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1219 (11th Cir. 2008) (holding that a housing provider "cannot be liable for refusing to grant a reasonable and necessary accommodation if [it] never knew the accommodation was in fact necessary" (internal quotation marks omitted)); *Hunt*, 814 F.3d at 1226 ("a plaintiff can be said to have made a request for accommodation when the defendant has enough information to know of both the disability and desire for an accommodation" (internal quotation marks omitted)). Defendants' knowledge would also be relevant if Capezza were claiming disability under the "regarded as" prong of 42

U.S.C. § 3602(h). *See, e.g., Sutton v. Lader*, 185 F.3d 1203, 1208 (11th Cir. 1999) (evaluating the "perception" theory under pre-ADAAA standards).

In this case, however, Capezza is proceeding under an "actual disability" theory pursuant to the first prong of 42 U.S.C. § 3602(h). Doc. 39 at ¶ 13; *Smith v. Quintiles Transnat'l Corp.*, 509 F.Supp.2d 1193, 1206 (M.D. Fla. 2007). Defendants cite no authority to suggest that their knowledge of Capezza's medical condition is relevant to whether Capezza was actually disabled during the events at issue. Defendants' Motion is therefore denied to the extent that it challenges Capezza's status as a disabled individual.

Capezza's Motion is also denied on this issue. Although Defendants do not challenge the sufficiency of Dr. Friedmann's declaration, this Court is obligated to ascertain whether Capezza is entitled to judgment on the merits. *United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1102 (11th Cir. 2004). Dr. Friedmann's declaration only conclusorily opines that Capezza is limited in "her cognition, her ability to work, care for herself and otherwise carry out daily life activities." Doc. 68–3 at ¶¶ 2; *see also id.* at ¶ 11; *Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1227–28 (11th Cir. 1999) (holding that expert's conclusory statements regarding the plaintiff's alleged limitations were unsupported by specific facts). Capezza does not explain how her difficulty in cognition is impaired, and her assertion on that front is at least arguably inconsistent with Dr. Friedmann's observation that Capezza "spends most of the day sitting in front of the TV or reading." Friedmann Dec. at ¶ 11; *cf. Littleton v. Wal–Mart Stores, Inc.*, 231 Fed.Appx. 874, 877 (11th Cir. 2007) (noting that the plaintiff's ability to drive a car was arguably "inconsistent

with his assertion that his abilities to think and learn are substantially limited"). Neither Dr. Friedmann's declaration nor Plaintiffs' Motion identifies specific record evidence demonstrating that Capezza was unable to perform a broad range or class of jobs so as to be considered substantially limited in the major life activity of working. *Rossbach v. City of Miami*, 371 F.3d 1354, 1359 (11th Cir. 2004) (applying the pre-ADAAA standard for evaluating whether a plaintiff is substantially limited in the major life activity of working). Capezza cites no significant evidence relevant to her ability to perform personal care tasks, sufficient to support a finding that she is substantially limited in the major life activity of caring for herself. *Cf. Calvo v. Walgreens Corp.*, 340 Fed.Appx. 618, 621 (11th Cir. 2009) (holding that plaintiff had demonstrated a factual issue where she "provided an affidavit stating that she is unable to dress or undress herself without help, and she also testified that she is unable to shower and wash herself without help"). To the extent that Plaintiff claims a substantial limitation in sleeping, her alleged "difficulty sleeping" is "couched in vague terms and unaccompanied by any evidence that the described affliction[ ] [is] any worse than is suffered by many adults." *Rossbach*, 371 F.3d at 1358.

While Capezza may be able to marshal the necessary evidence at trial to prove that she was actually disabled during the relevant timeframe, she fails to demonstrate her entitlement to judgment as a matter of law on this foundational issue. *See also Lawson v. Plantation Gen. Hosp., L.P.*, 704 F.Supp.2d 1254, 1279 (S.D. Fla. 2010) (explaining that the weight of authority holds that whether an impairment is substantially limiting is typically a question for the factfinder). As a result, Plaintiffs' Motion for Summary Judgment is denied on her failure-to-accommodate claims (Counts I, III, V, VI, VII, VIII).

## 2. Capezza's request for an accommodation and Defendants' refusal

The remaining elements of a failure-to-accommodate claim require Capezza to establish that she requested a reasonable accommodation, that the request was necessary for Capezza to use and enjoy her dwelling, and that Defendants refused that request. *Hunt*, 814 F.3d at 1225. Although Defendants never expressly denied a request for accommodation, Capezza argues that Defendants' conduct amounts to a constructive denial. Defendants counter that they were never given enough information to meaningfully review Capezza's request and therefore cannot be found to have constructively denied her request.

■ A housing provider "cannot be liable for refusing to grant a reasonable and necessary accommodation if [it] never knew the accommodation was in fact necessary." *Schwarz*, 544 F.3d at 1219 (internal quotation marks omitted). On the other hand, if a housing provider is skeptical about an alleged disability or its ability to provide an accommodation, the provider is required "to request documentation or open a dialogue" in what is known in the ADA-context as the "interactive process." *United States v. Hialeah Hous. Auth.*, 418 Fed.Appx. 872, 877 (11th Cir. 2011) (internal quotation marks omitted); *accord Bhogaita*, 765 F.3d at 1287; *see also Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996).

As part of the dialogue, the housing provider may request "information necessary to apprise [it] of the disability and the desire and possible need for an accommodation," but the provider is not entitled to extraneous information. *Bhogaita*, 765 F.3d at 1287. The U.S. Department of Housing and Urban Development ("HUD") and the U.S. Department of Jus-

tice have issued a Joint Statement that discusses the permissible scope of a housing provider's inquiry:

[I]n response to a request for a reasonable accommodation, a housing provider may request reliable disability-related information that (1) is necessary to verify that the person meets the Act's definition of disability (*i.e.*, has a physical or mental impairment that substantially limits one or more major life activities), (2) describes the needed accommodation, and (3) shows the relationship between the person's disability and the need for the requested accommodation.... A doctor or other medical professional ... may ... provide verification of a disability. In most cases, an individual's medical records or detailed information about the nature of the person's disability is not necessary for this inquiry.

Once a housing provider has established that a person meets the Act's definition of disability, the provider's request for documentation should seek only the information that is necessary to evaluate if the reasonable accommodation is needed because of a disability. Such information must be kept confidential[.]

Doc. 1–6 at 14–15.[5] HUD has also issued a Notice containing specific guidance on requests for service animals and assistance animals ("the Notice"). Doc. 1–7. The Notice counsels that "[f]or purposes of reasonable accommodation requests," the FHA does not require "an assistance animal to be individually trained or certified." *Id.* at 3.

■ "The FHA does not demand that housing providers immediately grant all requests for accommodation." *Bhogaita*, 765 F.3d at 1285–86. However, "[t]he fail-

ure to make a timely determination after meaningful review amounts to constructive denial of a requested accommodation, as an indeterminate delay has the same effect as an outright denial." *Id.* at 1286. Conversely, a housing provider is not permitted to "short-circuit" the interactive process. *Overlook Mut. Homes, Inc. v. Spencer*, 415 Fed.Appx. 617, 622 (6th Cir. 2011); *Astralis Condo. Ass'n v. Sec'y, U.S. Dep't of Hous. & Urban Dev.*, 620 F.3d 62, 69 (1st Cir. 2010).

■ In assessing whether a constructive denial has occurred, "courts often consider whether the delay was caused by the defendant's unreasonableness, unwillingness to grant the requested accommodation, or bad faith, as opposed to mere bureaucratic incompetence or other comparatively benign reasons." *Logan v. Matveevskii*, 57 F.Supp.3d 234, 257–58 (S.D.N.Y. 2014). As the Seventh Circuit has explained in the ADA context:

[N]either party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary.

*Beck*, 75 F.3d at 1135. "In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility." *Id.*

■ Defendants attempt to assign responsibility for the breakdown in this case to Capezza, arguing that she "refused to provide" the information they requested. Doc. 76 at 7. Defendants correctly note

---

**5.** Although the Joint Statement is a policy statement "and therefore does not warrant *Chevron*-style deference, it is nonetheless entitled to respect to the extent it has the power to persuade." *Bhogaita*, 765 F.3d at 1286 n.3 (internal quotation marks and citations omitted).

that Plaintiff testified during her deposition that she did not believe that she needed to provide additional information—in particular, she did not believe there was a "need to go to a new board and start all over again" or to provide her personal medical records to Defendants. Capezza Dep. at 38–39, 62. However, as Capezza argues, Defendants overlook several facts that, when considered collectively, would allow a reasonable factfinder to conclude that Defendants both short-circuited and delayed the interactive process, resulting in a constructive denial of Capezza's request.

First, while Defendants had the right to request additional information regarding Capezza's disability and her proposed accommodation, the December 31, 2014, letter was overbroad under the standards set forth in HUD's Joint Statement and Notice. The December 31, 2014, letter requested Capezza's medical records, rather than simply asking for verification from a healthcare provider that Capezza suffered from a disability. Doc. 57–3 at 1. And the letter inappropriately inquired into whether Buttons had "special skills or training," including certification. *Id.* at 2. While the overbreadth of the December 31, 2014, letter does not give rise to an independent basis for liability, it is relevant to whether Defendants failed to accommodate Capezza's alleged disability. *Solodar v. Old Port Cove Lake Point Tower Condo. Ass'n, Inc.*, No. 12-80040-CIV, 2012 WL 1570063, at \*7 (S.D. Fla. May 2, 2012).

Following the December 31, 2014, letter, the January 6, 2015, letter incorrectly related that Capezza had "totally ignored" the association's "numerous requests" for information. Doc. 57–4 at 2. The record reveals only one request for information: the December 31, 2014, letter. And contrary to Defendants' arguments, a factfinder could determine that Capezza simply did not have the opportunity to comply with that request. Given the intervening weekend and New Year's Day holiday, Capezza was left with one business day, Friday, January 2, 2015, to satisfy what Pilka described as Brookhaven's "onerous" requirements. Doc. 57–2 at 2.

Defendants attempt to downplay the January 6, 2015, letter by insisting that it was "a statutory *request*, not a demand or threat" and merely "an *offer* for mediation." Doc. 57 at 11 (emphasis in original); Doc. 89 at 12 (emphasis in original). In reality, the letter stated three times that Brookhaven "demand[ed]" that Capezza engage in pre-suit mediation. *Id.* at 1–2. If Capezza did not submit to pre-suit mediation, Brookhaven threatened to bring a lawsuit "without further warning" and "without further notice" and to seek attorneys' fees and costs. *Id.* at 2, 4. Defendants also overlook the stated purpose of their January 6, 2015, letter: Brookhaven was issuing a statutory pre-suit demand for mediation because such a demand was "required before a lawsuit can be filed concerning the dispute." Doc. 57–4 at 2. By declaring their intent to move forward with a lawsuit, a reasonable factfinder could conclude that Defendants had already decided not to grant Capezza an accommodation, constituting a constructive denial of her request.

Defendants rely heavily on *Hawn v. Shoreline Towers Phase 1 Condominium Association, Inc.*, in which the Eleventh Circuit affirmed summary judgment on a failure-to-accommodate claim. 347 Fed. Appx. 464, 468 (11th Cir. 2009). There, the plaintiff, Davis Hawn, requested that his condominium association change its no-pets policy for all residents because Hawn had recently gone on vacation and acquired a puppy named Booster. *Id.* at 465. Hawn's request made no mention of a disability and repeatedly referred to

Booster as a "pet," "pup," and "companion." *Id.* Six months later, Hawn sent another letter to the association, in which he reported that he suffered from a "physical disability and psychiatric disability" and requested that Booster be considered a "service animal," exempt from the no-pets policy. *Id.* at 465–66. The association's general manager told Hawn that additional documentation was needed, which Hawn failed to provide. *Id.* at 466. Sixteen days later, the association sent Hawn a letter denying his request. *Id.* In rejecting Hawn's failure-to-accommodate claim, the Eleventh Circuit reasoned that:

> Hawn's [second] letter included unclear explanations as to the nature and extent of his disability and was wholly inconsistent with the reasons he provided in his [first] letter for wanting Booster in his condominium unit. Hawn's refusal to comply with subsequent requests for reasonable documentation prevented Shoreline from conducting a meaningful review of Hawn's application *and thereby Shoreline could not have actually known of Hawn's disability and the necessity of a service animal.*

*Id.* at 468 (emphasis added).

In contrast to *Hawn*, Capezza presents probative evidence that Brookhaven had already determined that she was entitled to an accommodation based on her disability. David Milne, a former board member and board secretary, declares that Capezza was approved to live with her dog based on documentation that she submitted regarding her disability. Milne Dec. at ¶¶ 5, 7; Capezza reported that fact in her December 17, 2014, letter, but the letters directed to Capezza on December 31, 2014 and January 6, 2015, did not acknowledge the existing accommodation. Doc. 1–10 at 2; *see generally* Doc. 57–2, Doc. 57–4.

Defendants assert that they "disagree with Plaintiff Capezza's assertion that she had already been given permission to reside with Buttons." Doc. 89 at 11. However, Defendants cite no record evidence to support this statement, or to otherwise call into question the evidence from both Capezza and Milne that Capezza had been approved to live with a dog. Defendants also cite no evidence suggesting that Brookhaven even investigated Capezza's claim. To the contrary, Brookhaven's corporate representative, Tammy Walker, testified that she never personally asked Nutter whether he gave Capezza permission to have an emotional-support animal. Walker Dep. at 36.

For the purposes of summary judgment, the Court accepts Capezza's version of events that she received prior approval. That prior approval, which was not present in *Hawn*, significantly undermines Brookhaven's argument that it "could not have actually known of [Capezza's] disability and the necessity of a [support] animal." 347 Fed.Appx. at 468; *see Hodgetts v. City of Venice*, 794 F.Supp.2d 1265, 1275 (M.D. Fla. 2011) (finding disputed issues of material fact as to whether the plaintiff was obviously disabled, in part because the employer revoked previously granted accommodations). Brookhaven's unexplained change in policy, which occurred over the course of approximately one year, also supports an inference that Brookhaven was acting in bad faith. *See Alley v. Les Chateaux Condo. Ass'n, Inc.*, No. 8:10-cv-760, 2010 WL 4739508, at *4 (M.D. Fla. Nov. 16, 2010) (noting that change in policy supported a finding of constructive denial of plaintiff's request for accommodation); *Peklun v. Tierra Del Mar Condo. Ass'n, Inc.*, No. 15-CIV-80801, 2015 WL 8029840, at *14 (S.D. Fla. Dec. 7, 2015) (holding that the board had an obligation to open a dialogue before denying the plaintiff's request for an exception to the no-pets policy, where the plaintiff had pre-

viously been granted an accommodation and the board had notice of this fact).

Further distinguishing the instant case from *Hawn*, Capezza did respond to Defendants. In her December 17, 2014 letter, Capezza specifically referenced her "severe anxiety" and provided a second, current prescription from her doctor. Doc. 1–10 at 2; Doc. 57–1. And by letter dated February 20, 2015, Capezza's counsel, LaHart, invited Defendants to "begin the interactive process to provide you verification within the parameters HUD and courts have established regarding the appropriate scope of inquiry that can be made by a housing provider." Doc. 1–5 at 7. Nonetheless, on February 23, 2015, Defendants voted to enforce the Declarations against Capezza and Smith. Shimunek Dec. at ¶¶ 10–11; Doc. 39 at ¶¶ 78, 98, 109, 120, 131; Doc. 40 at ¶¶ 78, 98, 109, 120, 131. On February 24, 2015, Pilka again inquired as to whether Capezza would engage in pre-suit mediation, and LaHart again responded that her clients were "willing to provide the association the verification to which it is entitled by law, but serving a demand for pre-suit mediation is NOT engaging in the interactive process." Doc. 77–1 at 7. The record documents no further contact between the parties.

Based on all of the circumstances, and taking the available inferences in Capezza's favor, a factfinder could conclude that Defendants were not interested in "open[ing] a dialogue," and that any breakdown in communications or inability to undertake "meaningful review" was traceable to Defendants, not to Capezza. *Bhogaita*, 765 F.3d at 1287; *Beck*, 75 F.3d at 1135. A factfinder could further determine, based on the available record, that Defendants' accelerated demand for pre-suit mediation and insistence on pursuing legal action was motivated by "unreasonableness, unwillingness to grant the re-quested accommodation, or bad faith, as opposed to mere bureaucratic incompetence or other comparatively benign reasons." *Logan*, 57 F.Supp.3d at 257–58. As a result, Capezza identifies sufficient record evidence to allow a factfinder to conclude that Defendants constructively denied Capezza's request for accommodation. Because Defendants do not otherwise challenge Capezza's ability to establish her failure-to-accommodate claims, Defendants' Motion for Summary Judgment is denied on those claims (Counts I, III, V, VI, VII, VIII).

## B. Intimidation

In addition to prohibiting discrimination on the basis of disability, the FHA includes the following anti-retaliation provision:

It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3065, or 3603 of this title.

42 U.S.C. § 3617. To state a claim under 42 U.S.C. § 3617, a plaintiff must establish intentional discrimination. *Harvick v. Oak Hammock Pres. Cmty. Owners Ass'n Inc.*, No. 6:14-cv-937, 2016 WL 362434, at *4 (M.D. Fla. Jan. 29, 2016) (citing *Sofarelli v. Pinellas County*, 931 F.2d 718, 722 (11th Cir. 1991)); *accord Gonzalez v. Lee Cty. Hous. Auth.*, 161 F.3d 1290, 1300 n.35 (11th Cir. 1998). When a plaintiff seeks to prove intentional discrimination through circumstantial evidence, as here, the familiar *McDonnell Douglas* burden-shifting scheme applies. *E.–Miller v. Lake Cty. Highway Dep't*, 421 F.3d 558, 563–64 (7th Cir. 2005) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93

S.Ct. 1817, 36 L.Ed.2d 668 (1973)); *Hopler v. Crystal Tower, Inc.*, No. 13-62465-CIV, 2014 WL 3894261, at *4 (S.D. Fla. June 20, 2014).

To establish a *prima facie* case of discrimination, a plaintiff must show that: (1) she engaged in a protected activity, (2) the defendant subjected her to an adverse action, and (3) a causal link exists between the protected activity and the adverse action. *Philippeaux v. Apartment Inv. & Mgmt. Co.*, 598 Fed.Appx. 640, 644 (11th Cir. 2015); *Fisher v. SP One, Ltd.*, 559 Fed.Appx. 873, 878 (11th Cir. 2014).[6] If the plaintiff establishes her *prima facie* case, the burden then shifts to the defendant to articulate a non-discriminatory reason for the challenged action. *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004). If the defendant satisfies its burden, the plaintiff may demonstrate that the stated reason is a pretext for unlawful animus. *Id.*

 Both sides move for summary judgment on Capezza's intimidation claims against Brookhaven and Rubert. In advancing their respective arguments, neither side refers to the second and third steps of the *McDonnell Douglas* burden-shifting scheme. The parties' primary dispute appears to center on whether Capezza suffered an adverse action for purposes of her *prima facie* case, and to a lesser extent, whether she engaged in protected activity. Doc. 57 at 11–12; Doc. 89 at 11–12. The Court finds that there is sufficient evidence to support both prongs of the *prima facie* case.

Requesting a reasonable accommodation constitutes protected activity. *Meyer v. Sec'y, U.S. Dep't of Health & Human Servs.*, 592 Fed.Appx. 786, 792 (11th Cir. 2014). Capezza requested an accommodation, at the latest, through her December 17, 2014, letter. Doc. 1–10 at 2. Indeed, Defendants' December 31, 2014, response letter specifically states that they understood the December 17, 2014, letter to be a request for an accommodation. Doc. 57–3 at 1. The record also suggests that Capezza possessed the requisite "good-faith" belief that the requested accommodation was reasonable. *Philippeaux*, 598 Fed.Appx. at 645 (explaining that a plaintiff must have an objectively reasonable, good-faith belief that she was engaging in protected activity). Not only is an alteration to an association's no-pet policy generally considered a reasonable accommodation, *Warren v. Delvista Towers Condo. Ass'n, Inc.*, 49 F.Supp.3d 1082, 1086–87 (S.D. Fla. 2014), Brookhaven had already granted that accommodation according to Capezza.

With respect to the second element, whether Capezza suffered an "adverse action," the relevant question is whether Brookhaven's or Rubert's conduct qualifies as coercion, intimidation, threats, or interference. *See, e.g., Wood v. Briarwinds Condo. Ass'n Bd. of Dirs.*, 369 Fed.Appx. 1, 3 (11th Cir. 2010) ("[t]hat conduct does not rise to the level of intimidation or threats"); *Dixon v. The Hallmark Cos., Inc.*, 627 F.3d 849, 858 (11th Cir. 2010) (holding that the plaintiffs must prove that defendants "coerce[d], intimidate[d],

---

**6.** In contrast to the Eleventh Circuit's decision in *Sofarelli, Fisher* and *Philippeaux* require evidence of an intent to retaliate, rather than an intent to discriminate based on a protected characteristic. *See Sofarelli*, 931 F.2d at 722 ("In order to prevail under [§ 3617], Sofarelli has to establish that race played some role in the actions of Hibbing, Swetay and the neighbors"); *see also Campbell v. Robb*, 162 Fed.Appx. 460, 473–74 (6th Cir. 2006) (discussing the split in authority as to whether a discriminatory or a retaliatory motive is required under § 3617). For purposes of the instant Motions, the Court will assume, consistent with *Fisher, Phillippeaux*, and 24 C.F.R. § 100.400(c), that a retaliatory intent is sufficient.

threaten[ed], or interfere[d]" with the exercise of a right protected by the FHA); *Sofarelli*, 931 F.2d at 722 (holding that plaintiff's version of the facts "would clearly constitute coercion and intimidation under § 3617").[7] For the reasons that follow, the Court holds that there is sufficient evidence for a factfinder to conclude that Brookhaven and Rubert threatened or intimidated Capezza.

With respect to the claim against Brookhaven, Capezza alleges that the January 6, 2015, letter was a threat. Doc. 68 at 27. Brookhaven insists that the letter was not a threat. Doc. 57 at 11. The January 6, 2015, letter informed Capezza that her property "has been referred to our firm for legal action," and warned Capezza that if she failed to comply with the demand for pre-suit mediation or failed to pay one-half of the cost for mediation, "the Association will be authorized to proceed with the filing of a lawsuit against you without further notice, and may seek an award of attorney fees or costs incurred in an attempt to obtain mediation." Doc. 57-4 at 4. In short, Brookhaven offered Capezza two options if she wished to move forward with her request for an emotional-support animal: pay for mediation or be sued. A reasonable factfinder could therefore conclude that under all of the circumstances present in this case, including the accelerated timing of the demand, that the January 6, 2015, letter constituted intimidation or a threat. *See Neudecker v. Boisclair Corp.*, 351 F.3d 361, 363–64 (8th Cir. 2003)

(holding that threats of eviction sufficiently alleged an adverse action sufficient to state a § 3617 claim); *Hopler*, 2014 WL 3894261, at *4 (holding that plaintiff adequately stated a § 3617 claim where defendants sent a "Petition for Non–Binding Arbitration" and a letter threatening legal action following the plaintiff's request for accommodation, and where defendants then filed a federal lawsuit against plaintiff after she filed a housing discrimination complaint).

The Court finds Brookhaven's cited authority, *Kromenhoek v. Cowpet Bay West Condominium Association*, distinguishable. In that case, the plaintiff requested that her association allow her to have an emotional-support dog as an exception to the no-pets policy. 77 F.Supp.3d 462, 466–67 (D. V.I. 2014). Although the plaintiff alleged that the association engaged in unlawful interference by imposing a daily fine for having a dog, the association had informed the plaintiff that the fine would be held in abeyance pending the board's review of her request for accommodation, and no fine was ever levied. *Id.* at 475. The district court therefore determined that the plaintiff did not suffer an adverse action based on the fines. *Id.* In this case, Brookhaven's communications with Capezza offered no such middle ground. Additionally, Brookhaven ultimately voted to enforce the Declarations against Capezza. Shimunek Dec. at ¶ 11; Doc. 39 at ¶¶ 78,

---

7. Borrowing from the adverse-action standard used in employment discrimination cases, some courts require a "materially adverse" action, sufficient to dissuade a reasonable resident from making a charge of discrimination under the FHA. *E.g., Hall v. Greystar Mgmt. Servs., L.P.*, 28 F.Supp.3d 490, 495 (D. Md. 2014). However, in contrast to Title VII's anti-retaliation provision, the FHA prohibits four specific types of conduct: coercion, intimidation, threats, and interference.

*Compare* 42 U.S.C. § 3617, *with* 42 U.S.C. § 2000e–3(a) (making it unlawful for an employer to "discriminate" based on protected activity). Accordingly, the Court considers the more specific question of whether the challenged conduct amounts to coercion, intimidation, threats, or interference, but notes that, even if a "materially adverse" standard is applied, Capezza comes forward with sufficient evidence to meet that standard at this stage.

98, 109, 120, 131; Doc. 40 at ¶¶ 78, 98, 109, 120, 131.

Capezza also pleads a separate intimidation claim against board member Jim Rubert. Doc. 39 at ¶¶ 84–92. According to Plaintiff Smith's companion, Judy Shimunek, she, Capezza, and Smith attended a February 23, 2015, board meeting. Shimunek Dec. at ¶ 10. At that meeting, the individual defendants, including Rubert, voted to enforce the Declarations against Capezza and Smith. *Id.* at ¶ 11; Doc. 39 at ¶¶ 78, 98, 109, 120, 131; Doc. 40 at ¶¶ 78, 98, 109, 120, 131. After the meeting, Rubert stated: "Did you know that saying your dog is a service dog when it is not is a Class D felony punishable by $50,000? I have checked with other attorneys in addition to our attorney who have verified this." Shimunek Dec. at ¶ 12.

Defendants characterize Rubert's remark as "single statement that . . . is insufficient to rise to the level of intimidation" required under 42 U.S.C. § 3617. Doc. 57 at 12. Defendants invoke a line of case law holding that the FHA "does not reach isolated acts of discrimination by other private property owners." *Sheikh v. Rabin*, 565 Fed.Appx. 512, 517–19 (7th Cir. 2014) (internal quotation marks omitted) (holding that isolated statements by various neighbors did not state a claim under § 3617); *Kromenhoek*, 77 F.Supp.3d at 477 (holding that § 3617 "does not make unfortunate skirmishes between neighbors unlawful"). Capezza correctly points out that Rubert is not merely Capezza's neighbor; he is a board member with authority to take action against Capezza. Moreover, Rubert's alleged remark possesses an arguable nexus to official board action because it was made immediately after Rubert and other members of the board voted to enforce the Declarations against Plaintiffs. *Cf. Walton v. Claybridge Homeowners Assoc., Inc.*, 191 Fed.

Appx. 446, 452 (7th Cir. 2006) (holding that remark by board member was too attenuated from any of the association's actions to establish a claim under § 3617).

Capezza maintains that she is entitled to summary judgment on the claim against Rubert because his statement "clearly intended to intimidate Plaintiffs." Doc. 68 at 28. However, it is not evident from the cited portions of the record if Rubert's statement was directed at Capezza, and if not, when and how Capezza became aware of the statement. *See Hous. Opportunities Project For Excellence, Inc. v. Key Colony No. 4 Condo. Assoc., Inc.*, 510 F.Supp.2d 1003, 1013 (S.D. Fla. 2007) (holding that no § 3617 claim was stated where alleged retaliation took place against other individuals). Shimunek declares that Rubert approached "us," without specifying who was present when Rubert made the statement, and Capezza herself relates that "Mr. Rubert had told *Judy* . . . [t]hat we would be fined or assessed $50,000 for having the dog in the park." Shimunek Dec. at ¶ 12; Capezza Dep. at 24–25 (emphasis added). On this limited record, judgment as a matter of law is not warranted in Capezza's favor.

Based on the foregoing, the parties' cross-Motions for Summary Judgment are denied as to Capezza's intimidation claims (Counts II and IV).

## C. Punitive Damages

 Defendants file a Second Motion for Summary Judgment challenging Capezza's entitlement to punitive damages. Doc. 67. "Punitive damages are available under the FHA when a defendant's conduct is 'motivated by evil motive or intent' or shows a 'reckless or callous disregard of, or indifference to a plaintiff's rights.' " *Moore v. Club at Orlando Condo. Ass'n, Inc.*, No. 6:09-cv-274, 2009 WL 4015571, at *4 (M.D. Fla. Nov. 19, 2009) (quoting

*Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)).

In contesting Capezza's claim for punitive damages, Defendants raise the same arguments discussed above: they maintain that Capezza is unable to establish liability because she failed to provide sufficient information for Defendants to evaluate her request for accommodation, and because Defendants engaged in no intimidation. Doc. 67 at 4–6. Defendants also argue in passing, without citation to record evidence, that their actions were not accompanied by the requisite intent or recklessness. *Id.* at 7.

For the reasons previously discussed, Defendants' arguments on liability are not persuasive, and there is an available inference of bad faith based on the timing and nature of Brookhaven's communications with Capezza. Absent a more detailed and focused challenge by Defendants, the Second Motion for Partial Summary Judgment is denied.

## IV. Conclusion

Based on the foregoing, it is **OR-DERED AND ADJUDGED** that:

(1) Defendants' Motion for Partial Summary Judgment (Doc. 57) is **DENIED**;

(2) Defendants' Second Motion for Partial Summary Judgment (Doc. 67) is **DENIED**; and

(3) Plaintiffs' Motion for Summary Judgment (Doc. 68) is **DENIED**.

**DONE AND ORDERED** in Tampa, Florida on October 12, 2016.